116 F.3d 1482
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
THE SIERRA CLUB and The Regional Association of Concerned
Environmentalists, Plaintiffs,
v.
UNITED STATES DEPARTMENT OF AGRICULTURE, Michael Espy,
United States Forest Service, Jack Ward Thomas,
Floyd Marita, and Louise Odegaard, Defendants.
 No. 96-2244.
 United States Court of Appeals, Seventh Circuit.
 May 28, 1997.
 
 ORDER
 The defendants filed this appeal from the District Court's grant of summary judgment for the plaintiffs on four of the nine counts in their complaint. After reviewing the decision of the District Court,the parties' appellate briefs, and the administrative record, we havedetermined that the District Court properly identified and resolved theissues before us on appeal. We therefore affirm the judgment andinjunction issued by the District Court for the reasons stated in thetwo attached memorandum opinions.
 MEMORANDUM AND ORDER
 Filed Sept. 25, 1995.
 GILBERT, Chief Judge:
 
 
 1
 Pending before the Court are cross-motions for summary judgment [Documents 19, 25] as well as a supplemental memorandum filed by plaintiff-intervenor Audubon Council. The plaintiffs have sought judicial review of an agency decision pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701-706 (1988), raising issues under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370d (1988), the National Forest Management Act ("NFMA"), 16 U.S.C. § 1604 (1988), the Multiple Use Sustained Yield Act ("MUSYA"), 16 U.S.C. §§ 528-531 (1988), and the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. §§ 703-712 (1988). Therefore, the Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 (1988).
 
 
 2
 As a preliminary matter, the Court notes that the plaintiffs have filed a motion to strike [Document 37] the defendants' reply brief. The Court agrees that the defendants were in error to file the brief without prior court authorization. However, in the interest of full discussion of the issues and in light of the fact that the plaintiffs have responded to this brief in their own reply brief, the Court DENIES the motion to strike.[1]
 
 I. BACKGROUND
 
 3
 The plaintiffs filed this action to challenge two records of decision issued in 1992 by the United States Forest Service. One of these decisions relates to the agency's adoption of an Amended Land and Resource Management Plan ("ALRMP") for the Shawnee National Forest. (Record of Decision, Amended Land and Resource Management Plan (hereinafter "ROD for ALRMP").) The other relates to the agency's decision to allow oil and gas leasing within the Shawnee. (Record of Decision, Oil and Gas Leasing (hereinafter "ROD for Oil and Gas Leasing").)
 
 
 4
 The ALRMP was created as a result of objections to the original Land and Resource Management Plan that was approved for the Shawnee in 1986. In an attempt to resolve administrative appeals that had been filed against the 1986 plan, the Forest Service entered into a settlement agreement with the organizations that had filed the appeals, which included the Sierra Club and the Audubon Council.[2] The document lists "the points of agreement that were reached" among the participants regarding various issues that had been appealed. (Appeal Settlement Agreement at 1.) Of particular note for purposes of this case are the sections concerning all-terrain vehicle ("ATV") use of the forest, management of habitat for forest interior species, and identification of areas recommended for wilderness study. The agreement further provided that:
 
 
 5
 [a]mendments and changes to the Forest Plan or changes in its implementation, where called for by the agreements in this document, will be carried out through the proper procedures in accordance with the requirements of the National Forest Management Act (NFMA) and the National Environmental Policy Act (NEPA), and other appropriate laws and regulations.
 
 
 6
 (Settlement Agreement at 2.)
 
 
 7
 Pursuant to the agreement, the environmental groups agreed to withdraw their appeals and to not initiate any further appeals or judicial review of the 1986 plan. (Settlement Agreement at 25.) They reserved their right to initiate and pursue appeals or judicial review of any future plan actions except with respect to the "specific claims raised in the appeal of the [1986 plan]." (Settlement Agreement at 25.) If any group pursued an appeal or judicial review realleging claims raised in the 1986 appeal, such action would void the settlement agreement as to that particular party. (Settlement Agreement at 25.) The agreement further stated that if the Forest Service failed to amend the Forest Plan as provided in the agreement, "that portion of the Agreement not enacted as provided herein shall be null and void and all obligations under it discharged, and all rights of any party to appeal or seek judicial review ... remain as they were on the effective date of this Agreement." (Settlement Agreement at 26.)
 
 
 8
 During the same time frame, the Forest Service began considering whether to amend the 1986 plan to adopt provisions for oil and gas leasing. These discussions were prompted by the Federal Onshore Oil and Gas Leasing Reform Act of 1987 and its implementing regulations, in which the Secretary of Interior requested that suitable National Forest System Lands be identified and offered for lease. The 1986 Shawnee Forest Plan had "already identified most lands as suitable for oil and gas exploration and development[ ]" but further environmental analysis was needed before authorizing the Bureau of Land Management to offer such land for lease. (ROD for Oil and Gas Leasing at 1.) "Because we had already begun the analysis for amending the Forest Plan as required in the Settlement Agreement, it was appropriate to expand the analysis to include oil and gas leasing." (ROD for Oil and Gas Leasing at 1.)
 
 
 9
 Regional Forester Floyd J. Marita signed the records of decision for both the ALRMP and the Oil and Gas Leasing program on March 23, 1992. The Chief of the Forest Service ultimately affirmed the ALRMP in a decision released on June 25, 1993. That decision became the agency's final administrative determination on July 23, 1993, when the Secretary of Agriculture declined to conduct a discretionary review pursuant to 36 C.F.R. §§ 217.7(e), 217.17 (1992). The oil and gas leasing decision was similarly affirmed on July 14, 1993, and became final when the Secretary of Agriculture declined discretionary review on July 30, 1993.
 
 
 10
 The Sierra Club and the Regional Association of Concerned Environmentalists ("RACE") filed the pending complaint on April 14, 1994, seeking judicial review of both the ALRMP and the oil and gas leasing decision. The Audubon Council's motion to intervene as a plaintiff was granted on April 10, 1995. The complaint alleges that both decisions violate NEPA, 42 U.S.C. §§ 4321-4370d (1988), NFMA, 16 U.S.C. § 1604 (1988), MUSYA, 16 U.S.C. §§ 528-531, and the MBTA, 16 U.S.C. §§ 703-712 (1988).
 
 II. ANALYSIS
 
 11
 Because this case involves judicial review of an agency's decision, the Court's resolution of this case is subject to a narrow standard. Under the APA, "[a]gency actions may be overturned only if they are--(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; ... [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right...." 5 U.S.C. § 706(2) (1988); Sierra Club v. Marita, 46 F.3d 606, 619 (7th Cir.1995). To determine whether agency action is arbitrary or capricious, the Court must consider "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378 (1989). As the Seventh Circuit stated in Sierra Club:
 
 
 12
 "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." ... [However,] deference does not mean obeisance. Deference will not "shield [an agency] action from a thorough, probing, in-depth review." ... Where an "agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," the agency has violated the standards of the APA.
 
 
 13
 46 F.3d at 619 (citations omitted).
 
 
 14
 To the extent that the plaintiffs seek judicial review of the agency's compliance with NEPA, the court's only role "is to insure that the agency has taken a 'hard look' at environmental consequences...." Kleppe v. Sierra Club, 427 U.S. 390, 410 n. 21 (1976). NEPA does not impose any substantive requirements, i.e., it "does not command the agency to favor an environmentally preferable course of action...." Sierra Club v. Espy, 38 F.3d 792, 802 (5th Cir.1994). Rather, it "simply prescribes the necessary process[ ]" that the agency must follow in its decisionmaking. Sierra Club v. Marita, 46 F.3d at 623. In short, "NEPA merely prohibits uninformed--rather than unwise--agency action." Sierra Club v. Espy, 38 F.3d at 802.
 
 
 15
 The plaintiffs' complaint contains nine counts which allege that the ALRMP and the oil and gas leasing decisions violate various provisions of NFMA, MUSYA, NEPA, and the MBTA. The Court will address each count in turn. However, to put the plaintiffs' arguments into their proper perspective, a brief historical overview of the development of the national forests and the statutory framework is in order.
 
 
 16
 Congress provided for the creation of national forests through the Creative Act of 1891, which gave the President authority to "set apart and reserve ... public lands wholly or in part covered with timber or undergrowth ... as public reservations." Charles F. Wilkinson & H. Michael Anderson, Land and Resource Planning in the National Forests, 64 Or.L.Rev. 1, 17-18 (1985) (quoting Act of Mar. 3, 891, ch. 561, 26 Stat. 1095, 1103, repealed by 90 Stat. 2792 (1976)). The Creative Act did not establish any specific guidelines for forest management. Six years later, however, Congress passed the Organic Administration Act of 1897 to more clearly specify the purposes of the national forests and provide some general guidelines. Act of June 5, 1897, ch. 2, 30 Stat. 34 (codified as 16 U.S.C. §§ 473-482, 551 (1988)). The Act provides, in pertinent part, that "[n]o national forest shall be established, except to improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessity of citizens of the United States...." 16 U.S.C. § 475 (1988).
 
 
 17
 Congress subsequently expanded the scope of forest administration in 1960 through the MUSYA, which states that "[i]t is the policy of the Congress that the national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes." 16 U.S.C. § 528 (1988). These purposes are "declared to be supplemental to, but not in derogation of, the purposes for which the national forests were established as set forth in section 475 of this title [i.e., the Organic Act]." Id.
 
 
 18
 Section 529 of the MUSYA directs the Secretary of Agriculture "to develop and administer the renewable surface resources of the national forests for multiple use and sustained yield of the several products and services obtained therefrom. In the administration of national forests due consideration shall be given to the relative values of the various resources in particular areas." 16 U.S.C. § 529 (1988). Multiple use is defined as:
 
 
 19
 The management of all of the various renewable surface resources of the national forests so that they are utilized in the combination that will best meet the needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; that some land will be used for less than all of the resources; and harmonious and coordinated management of the various resources, each with the other, without impairment of the productivity of the land, with consideration being given to the relative values of the various resources, and not necessarily the combination of uses that will give the greatest dollar return or the greatest unit output.
 
 
 20
 16 U.S.C. § 531(a) (1988).
 
 
 21
 To further facilitate forest management, Congress passed the Resource Planning Act of 1974, which included a provision requiring the Secretary of Agriculture to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System...." 16 U.S.C. § 1604(a) (1988). This general directive was expanded in the NFMA, which required the Secretary to promulgate regulations for the development of forest plans that conformed not only to the MUSYA but also to the more detailed procedural and substantive guidelines set forth in the NFMA itself. 16 U.S.C. § 1604 (1988). The procedural and substantive provisions applicable to this action are discussed in more detail below.
 
 A. Relative Values Analysis (Count I)
 
 22
 As discussed above, the MUSYA requires the Secretary to coordinate management of the various renewable resources on forest lands "with consideration being given to the relative values of the various resources, and not necessarily the combination of uses that will give the greatest dollar return or the greatest unit output." 16 U.S.C. §§ 529, 531(a) (1988). The plaintiffs argue that a proper "relative values" analysis requires the Forest Service to consider whether such renewable resources are being supplied from the private lands surrounding and intermingled with the Shawnee National Forest. The plaintiffs argue that the ALRMP fails to conduct this type of analysis and, as a result, overemphasizes resource uses such as artificially maintained openland areas, logging, oil and gas leasing, and ATV use and underemphasizes such resource uses as wilderness and wildlife habitat for neotropical migratory birds.
 
 
 23
 In support of their argument, the plaintiffs point to the Congressional findings enacted as part of the NFMA, which state, in relevant part, that:
 
 
 24
 Congress finds that ... to serve the national interest, the renewable resource program must be based on a comprehensive assessment of present and anticipated uses, demand for, and supply of renewable resources from the Nation's public and private forests and rangelands, thorough analysis of environmental and economic impacts, coordination of multiple use and sustained yield opportunities as provided in the [MUSYA], and public participation in the development of the program[.]
 
 
 25
 16 U.S.C. § 1600(3) (1988) (emphasis added). Based upon this directive, the plaintiffs argue that the ALRMP should have emphasized resources such as wilderness and neotropical bird habitat that can be provided only by the Shawnee and should have discounted those Shawnee resources such as timber that can and are readily produced on surrounding private lands in the state.
 
 
 26
 The legislative history for the NFMA supports the plaintiffs' argument that Congress intended to have the Forest Service consider the resources available on private lands when developing forest management plans. In explaining the new provisions in the NFMA, the Senate Report states that "[t]he findings further emphasize ... the role of private as well as public lands in meeting national needs, and the responsibility and opportunity for the Forest Service to provide leadership in managing and conserving natural resources." S.Rep. No. 893, 94th Cong., 2d Sess. 2 (1976), reprinted in 1976 U.S.C.C.A.N. 6662, 6663.
 
 
 27
 Contrary to the plaintiffs' view, however, this directive is not limited to the supply of and demand for resources in the immediate vicinity of a particular national forest or of the state in which the forest is located. Rather, the findings refer to "the Nation's public and private forests" and the Senate Report refers to the resources available to meet "national" needs (emphasis added). Certainly the Forest Service may, indeed should, consider resource supply and demand in its local area as part of this national analysis but the agency is not limited to a localized review.[3] Therefore, even though private lands in Illinois may be able to supply 100 percent of the timber needs of its own citizens, the Forest Service could properly determine that the timber resources of the Shawnee should be utilized to respond to a national demand. That is exactly the rationale provided by Regional Forester Marita in selecting an alternative that allowed for timber harvest in the Shawnee. (ROD for ALRMP at 19 ("I selected alternative 5 because it provides timber products to help supply the nation's need for quality hardwood sawtimber and veneer.")); (ROD for ALRMP at 20 ("alternative 4 was not selected because it does not provide a sustained-yield of quality hardwood products that the nation desires and needs, and that can be provided from the Shawnee National Forest in an environmentally sound manner."))
 
 
 28
 Although not cited by the plaintiffs, the legislative history to the MUSYA provides more persuasive support for the plaintiffs' demand for a "relative values" analysis focusing on localized conditions. In explaining the Act's multiple-use directive, the House Report discusses the "relative values" analysis as follows:
 
 
 29
 One of the basic concepts of multiple use is that all of these resources in general are entitled to equal consideration, but in particular or localized areas relative values of the various resources will be recognized....
 
 
 30
 In practice, the priority of resource use will vary locality by locality and case by case. In one locality timber use might dominate; in another locality use of the range by domestic livestock; in another outdoor recreation or wildlife might dominate. Thus, in particular localities the various resource uses might be given priorities because of particular circumstances. This is the meaning of the last sentence of section 2 of the bill. But no resource would be given a statutory priority over the others. The bill would neither upgrade nor downgrade any resource.
 
 
 31
 H.R.Rep. No. 1551, 86th Cong., 2d Sess. --- (1960), reprinted in 1960 U.S.C.C.A.N. 2377, 2379.
 
 
 32
 Based upon this discussion, it would appear that the plaintiffs are correct in suggesting that a proper "relative values" analysis would require the Forest Service to consider the particular circumstances of the local area in determining how to prioritize resource use in each national forest. However, while this type of analysis might suggest that one use might logically predominate over others because of localized needs or conditions, it does not require that the forest be managed solely for that one particular use. Nor does it require the Forest Service to focus entirely upon localized needs at the expense of ignoring the national demand for resources that can be supplied by a particular forest.
 
 
 33
 To the contrary, the MUSYA empowers the Forest Service with wide discretion to give equal consideration, but not necessarily equal weight, to all of these values. Wind River Multiple-Use Advocates v. Espy, 835 F.Supp. 1362, 1372 (D.Wyo.1993) (" 'Due consideration' does not mean equal consideration."). "Indeed, since 'Congress has given no indication as to the weight to be assigned each value, ... it must be assumed that the decision as to the proper mix of uses within any particular area is left to the sound discretion of the Forest Service.' " Id. (quoting Sierra Club v. Hardin, 325 F.Supp. 99, 123 (D.Alaska 1971); Bighole Ranches Ass'n v. United States Forest Serv., 686 F.Supp. 256, 264 (D.Mont.1988) (stating that the MUSYA grants the Forest Service "wide discretion to weigh and decide the proper uses with any area.").
 
 
 34
 There can be no dispute in this case that Forest Service gave ample consideration to the resource uses advocated by the plaintiffs, such as wildlife habitat and wilderness areas. In fact, the ALRMP provides that these uses be protected and expanded. What the plaintiffs object to, however, is the fact that the Forest Service has not prioritized such uses to the exclusion of other uses such as logging, oil and gas leasing, and ATV use; rather the Forest Service has attempted to provide "a balanced approach to meeting the various public desires for uses products and conditions on the Shawnee National Forest." (ROD for ALRMP at 9.)
 
 
 35
 The Forest Service was well within its discretion to attempt to achieve the identified uses in whatever mix the agency found suitable for the Shawnee. As long as the Forest Service has given each use equal consideration, this Court has no authority to second-guess the precise weight that the agency has given to each use, at least as it relates to the "relative values" analysis of the MUSYA, as alleged in Count I of the plaintiffs' complaint.[4] Other requirements of the MUSYA, NFMA, and NEPA are discussed in the sections that follow.
 
 
 36
 B. Viability of Management Indicator Species (Count II)
 
 
 37
 One of the plaintiffs' primary challenges to the ALRMP relates to the provisions for protecting the habitat of certain forest interior species, particularly neotropical migratory songbirds. These birds, which include such species as the Scarlet Tanager, Cerulean Warbler, and Wood Thrush, generally breed in the United States and then migrate to Central and South America during the winter. Many of the species require a nesting and breeding habitat consisting of large blocks of unfragmented or closed-canopy, mature hardwood forest.
 
 
 38
 The ALRMP provides for the establishment of Forest Interior Management Units (FIMUs) to provide the critical habitat required by these birds. The ALRMP calls for 18 FIMUs of about 1,100 acres each. Seven are managed under Management Prescription 6.4, which provides for a 100-acre core within each FIMU that is exempt from management activities and requires that 750 acres of each FIMU consist of trees at least 50 years old. The plaintiffs allege that recent scientific evidence shows that the designated FIMUs are not large enough to ensure viability of these species. Thus, they have challenged the ALRMP under a variety of legal theories, each of which is discussed in turn.
 
 1. Relative Values Analysis
 
 39
 The plaintiffs first argue that the Forest Service has failed to recognize that the Shawnee is the only location in Illinois that can realistically provide suitable nesting and breeding habitat for neotropical migratory songbirds. Therefore, under the relative values analysis required by the MUSYA, the plaintiffs argue that the Forest Service should have ensured that the ALRMP provided for protection of the largest FIMUs possible and should have avoided uses that detract from the value of the forest interior habitat for these species, such as logging, ATV trails, wildlife openings and oil and gas leases. Although these other activities are valid multiple uses, the plaintiffs argue that the Forest Service should have ensured that they take place outside the FIMUs.
 
 
 40
 The plaintiffs' chief complaint is that the ALRMP allows for artificially created openlands within the FIMUs (but outside the FIMU's 100-acre core) to provide habitat for openland species. As a result, they contend that the ALRMP gives equal treatment to openland species and forest interior species despite the fact that the latter are diminishing in number. They argue that this equal treatment turns the relative values analysis on its head because the Shawnee provides a unique opportunity to provide forest interior habitat that is not available on surrounding private lands within Illinois. They assert that openland species, by comparison, are abundant in Illinois and many are generalists that can exist in forest interior environments as well.
 
 
 41
 A review of the Record of Decision and the Final Supplemental Environmental Impact Statement ("FSEIS") for the ALRMP demonstrates that the Forest Service did make a proper relative values analysis. In stating his reasons for adopting Alternative 5 as the ALRMP, Regional Forester Marita first noted the conflict between interior forest species and openland species. (ROD for ALRMP at 15.) He recognized that some people believe that the Shawnee should provide a variety of ecological conditions and wildlife habitats, including openlands, while:
 
 
 42
 [o]ther people say that the primary role of the Shawnee National Forest should be to provide forest-interior conditions that are so rare in Illinois. These people are concerned about the drastic population declines for several migrant birds, and believe that the Forest Service should not use practices that create additional openings in the forest canopy.
 
 
 43
 (ROD for ALRMP at 15.) Thus, the regional forester was well aware of the relative value of this resource. (See also FSEIS App. A-7 (acknowledging that "if unfragmented habitat is to be retained for forest interior species in Illinois, the Shawnee National Forest is where most will be located.")) Accordingly, he stated that Alternative 5 "was especially important" to him because of its emphasis on providing habitat for forest interior species. (ROD for ALRMP at 15.)
 
 
 44
 But adoption of the ALRMP did not turn on this fact alone; the regional forester also had to consider the competing interests in providing openlands habitat. Therefore, he elected to proceed with a compromise plan that would serve both interests. (ROD for ALRMP at 15 ("I selected alternative 5 because it will enhance the overall biodiversity of the Shawnee National Forest and provide a variety of habitat for both non-game and game wildlife species.")) This decision was supported in part by the Forest Service's regulations requiring that "[f]ish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area." 36 C.F.R. 219.19 (1992); see also 16 U.S.C. § 1604(g)(3)(B) (1988) (requiring land management plans to "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives...."). As the Forest Service points out, "[o]bviously this includes openland-dependent animals as well as forest dwellers." (FSEIS App. I-29.)[5] Failure to provide for openland habitat would mean that over the long term, "National Forest System lands would not be able to support minimum viable populations of these species." (ROD for ALRMP at 17.)
 
 
 45
 The decision also was based upon recreational interests served by openlands. The Record of Decision states that openings "will be managed with special emphasis on the needs of deer, turkey, and quail that provide enjoyment for the many hunters who use the Shawnee National Forest." (ROD for ALRMP at 14-15.) However, the Forest Service also stated that openings provide recreational opportunities for hikers, campers, wildlife watchers, and general enthusiasts as well. (FSEIS App. at I-27, I-30.) The Record of Decision also notes that failure to maintain any openings would not allow the Forest Service to cooperate with the Illinois Department of Conservation on a program to reintroduce ruffed grouse in the Plank Hill area. (ROD for ALRMP at 17.)
 
 
 46
 The plaintiffs contend that openland species are abundant in Illinois and, therefore, protection of openland habitat fails to recognize the relative value of this resource in relation to the rare opportunity to provide forest interior habitat. However, a review of the record shows that the Forest Service did in fact evaluate the relative value of openlands in the local area:
 
 
 47
 We recognize that private lands include large areas of openland near the Forest. These openlands, however, are generally not high-quality habitat for openland species: they lack native plant species[,] diversity and management to maintain openland diversity, are frequently overgrazed, and much is harvested and plowed in the autumn.... We will consider natural openland and high-quality privately owned openland habitat when determining whether to establish or maintain openings.... Our priority is to use naturally occurring openland and old fields to meet openland habitat needs where possible. But in some areas, where private lands, herbaceous openlands or old field successional habitat are not fulfilling the need, artificial openings are and will be used to provide habitat for openland-dependent species.
 
 
 48
 (ROD for ALRMP at I-29 (citations omitted).) The Forest Service further noted that the forest openings may attract deer from surrounding lands to be harvested by hunters, thereby benefitting adjacent landowners by reducing some of the deer abundance on their lands. (ROD for ALRMP at I-29.) Implicit in this statement is the acknowledgment that hunting opportunities exist primarily upon public lands. Therefore, to meet this recreational demand in southern Illinois, it is necessary to ensure that openland species are preserved on forest land even though they may also be present on nearby private lands.
 
 
 49
 In short, the ALRMP was based upon due consideration of the relative values of both the neotropical migratory songbirds and openland species. Having reached this conclusion, the Court cannot second-guess the Forest Service's decision to emphasize a mix of uses rather than following the plaintiffs' suggestion that the forest be managed primarily for forest interior species. To the contrary, the Forest Service's attempt to strike a careful balance between both forest interior species and openland species is well-reasoned and rational, particularly in light of the scientific uncertainty regarding the management of forest interior species. As the Forest Service explained, "[t]he fact that we do not know all the answers yet is one reason why we are managing Forest Interior Management Units to minimize fragmentation, even though we're not sure that that will help insure the long term viability of forest interior birds throughout the Shawnee." (FSEIS App. at I-18.)
 
 2. NEPA Compliance
 
 50
 The plaintiffs allege that Forest Service has violated NEPA because both the ALRMP and FSEIS fail to acknowledge the serious population declines of the neotropical migratory songbirds and because the Forest Service has not provided a meaningful discussion of the most recent scientific study regarding the habitat requirements of such species or of the cumulative effects that the various uses such as logging, oil and gas leases, and ATVs, will have upon the forest. The plaintiffs further argue that the FSEIS's projections of songbird populations are invalid because they are based upon outdated data.
 
 
 51
 Contrary to the plaintiffs' contention, the FSEIS does acknowledge the serious population declines of forest interior species and provides a detailed analysis of the scientific studies regarding appropriate habitat size for such species. (FSEIS App. at I-16--I-24.) What the Forest Service found was great scientific uncertainty regarding the issue. (FSEIS at 16-17 ("Neither we nor the research community fully understand the effects of management activities on forest interior habitat.").)
 
 
 52
 The plaintiffs argue that the Forest Service has ignored the most recent scientific evidence presented in a 1989 study by Chandler S. Robbins, Deanna K. Dawson, and Barbara A. Dowell of the United States Fish and Wildlife Service. (Pls.' Ex. 3.)[6] To the contrary, this study is one of many reports and opinions analyzed by the Forest Service in response to concerns about the ALRMP's provisions for forest interior species. (FSEIS App. at I-17, I-19.) The real conflict between the plaintiffs and the Forest Service is with respect to the proper interpretation of the 1989 study and its implications for management in the Shawnee.
 
 
 53
 The plaintiffs focus on the 1989 study's suggestion that the ideal habitat to maximize all forest interior species would be 3,000 hectares (about 7,400 acres). The plaintiffs concede that the study suggests that smaller areas may be sufficient for some species and that the space needed for breeding success was also sometimes smaller. However, the plaintiffs interpret this study as demonstrating that even if 7,400-acre tracts are not possible, then management should strive for the largest tracts possible.
 
 
 54
 The Forest Service acknowledged the study's suggestion that 7,400-acre tracts were necessary to provide "the highest probability" that all types of forest interior birds would be found within that area. However, the study itself acknowledges that while some reserves of thousands of acres in size should be protected, "[m]ost managers ... will be concerned with maintaining natural ecosystems, or remnants thereof, in tracts of a few square kilometers or much less." (Pls.' Ex. 3, at 30.)
 
 
 55
 In these instances, providing for optimum shape ..., habitat representation ..., minimization of isolation ..., and limitation of disturbance becomes extremely important. Beyond that, selecting portions of the richest and most productive habitats for inclusion in the core of an undisturbed tract should do much to protect the largest number of species of special concern. First and foremost, a forest preserve should be dedicated to the protection of the forest interior ecosystem, which for birds would include the area-sensitive species and wide-ranging species such as raptors. After providing adequately for the most sensitive species, plans can be added for other species and other habitats as space and funding permit.
 
 
 56
 (Pls.' Ex. 3, at 30.)
 
 
 57
 The Forest Service points out that the Shawnee falls into the latter category because "[t]he land ownership patterns within our proclamation boundary ... make it apparent that providing Forest Interior Management Units of 3,000 hectares ... is nearly impossible." (FSEIS App. at I-19.) Based upon this discussion, it is evident that the Forest Service fully considered the 1989 study and its application to the particular circumstances of the Shawnee. Although the Forest Service found it impractical to create FIMUs that exceeded 7,400 acres in size, the agency did adopt some the alternative strategies suggested by the study, such as combining FIMUs with wilderness areas and prohibiting timber harvest and other disturbance activities within the core area of FIMUs.
 
 
 58
 The Court also finds no merit to the plaintiffs' similar contention that the Forest Service ignored the views of Scott Robinson, an ornithologist with the Illinois Natural History Survey. The Forest Service indicated that it agreed with the information in Robinson's reports but noted that "the research is not yet completed, and as Dr. Scott Robinson points out ... 'no conclusions can be drawn on the effects of management at this time.' " (FSEIS App. at I-18.) Thus, contrary to the plaintiffs' allegations, this is not a case where the Forest Service has failed to respond to the opinions of a well-respected scientist. See Seattle Audubon Society v. Moseley, 798 F.Supp. 1473, 1479 (W.D.Wash.1992) (stating that an ElS that fails to respond to opinions of well-respected scientists concerning the hazards of a proposed action is fatally deficient).
 
 
 59
 The plaintiffs next challenge the cumulative impacts analysis of the FSEIS.[7] They contend that the Forest Service has not properly discussed the cumulative impacts of the various uses authorized by the ALRMP but, instead, has merely set forth a laundry list of individual effects. Upon careful review of the document, the Court agrees that its cumulative effects analysis does not meet the requirements of NEPA.
 
 
 60
 NEPA requires that "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment" must be accompanied by a detailed statement that discusses, inter alia, "the environmental impact of the proposed action" and "any adverse environmental effects which cannot be avoided should the proposal be implemented[.]" 42 U.S.C. § 4332(2)(C) (1988). The Council on Environmental Quality regulations implementing NEPA provide that the scope of an EIS shall include a discussion of connected and cumulative actions and that a discussion of the impacts is to include direct, indirect and cumulative impacts. 40 C.F.R. § 1508.25 (1992). Cumulative impact is defined as:
 
 
 61
 the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.
 
 
 62
 40 C.F.R. § 1508.7 (1992).
 
 
 63
 The FSEIS for the ALRMP contains a section that purports to evaluate the cumulative effects of the proposed alternatives. However, the section is inadequate in two ways. First, the discussion fails to include all of the effects of the various activities that would be allowed under the ALRMP. For example, in discussing the impact that the proposed plan would have upon fish and wildlife, the FSEIS explains in great detail the effects of timber harvests and artificial openings, but only makes a brief passing reference to the minor effects of ATV use and contains no discussion whatsoever of the impact of oil and gas leasing or other minerals development. (FSEIS at 4-109 to 4-118.)
 
 
 64
 Secondly, and perhaps most significantly, the discussion fails to analyze the effects of the various activities in combination. For example, in discussing the impact that the proposed plan will have on forest interior habitat, the Forest Service provides (as the Sierra Club points out) a laundry list of adverse effects. (See FSEIS at 4-121.) However, there is no discussion whatsoever of whether these incremental effects, when taken together, will have a more serious impact. In other words, the FSEIS's analysis acknowledges, in one terse paragraph, that (1) timber harvest will lower nesting success of forest interior birds by increasing the amount of edge habitat, (2) use of ATVs will increase disturbances to nesting birds, and (3) "minerals activity" also could disturb nesting birds. (FSEIS at 4-121.) However, this does nothing more than restate what the FSEIS has already discussed in the direct/indirect effects analysis. The Forest Service never comes up with a cumulative assessment, i.e., there is no attempt to analyze the effects of (1), (2), and (3) to determine whether the sum of these incremental disturbances will create a significant detrimental effect.[8]
 
 
 65
 The plaintiffs' final challenge is to the sufficiency of the data that the Forest Service relied upon in a computer program that was used to predict how the ALRMP would affect population levels of the various animal species. The computer program, known as HEP (Habitat Evaluation Program), estimates the population level of each species by multiplying the number of acres of suitable habitat for that particular species by the number of animals of that species that is estimated to exist per acre. The plaintiffs allege that the Forest Service improperly arrived at this latter estimate based upon outdated data in studies by ornithologist Dr. Jean Graber. As Dr. Graber explained in an affidavit filed in the administrative appeal of the ALRMP, "the data from my studies is at least ten years old. The use of such data information in conjunction with vague projections of suitable habitat to establish present and future populations is scientifically unsupportable." (Pls.' Ex. 26 p 6.) Illinois Natural History Survey ornithologist Scott Robinson voiced the same concerns in a letter to the forest supervisor on February 8, 1988:
 
 
 66
 I do not feel that the Graber's population density estimates used for estimating "minimum acceptable populations" should be accepted as final. Dick and Jean Graber ... conducted many of these censuses long ago and in only a few parts of the Shawnee. Provisions should be made to redo many of the censuses to establish firmer population densities for each [management indicator species].
 
 
 67
 (Pls.Ex.33.)[9]
 
 
 68
 The Forest Service has not pointed to, and the Court is unable to find, any place in the administrative record where this specific issue was addressed. The Forest Service has adequately defended the use of the HEP computer program. However, the administrative record fails to respond to the sufficiency of the data that was fed into the program. As the plaintiffs point out, a computer program is only as reliable as its input; thus, they argue that if you put garbage in, you get garbage out.
 
 
 69
 The CEQ regulations state that the environmental information used by agencies in their decision-making "must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." 40 C.F.R. § 1500.1(b) (1992); see also 40 C.F.R. § 1502.24 (1992) ("Agencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements."); 40 C.F.R. § 1502.22 (1992) (where there is incomplete or unavailable information, agency must indicate that fact in the environmental impact statement). The Court recognizes that an agency's choice of methodology is entitled to substantial deference. See Louisiana ex rel. Fuste v. Verity, 853 F.2d 322, 329 (5th Cir.1988) ("under the arbitrary-and-capricious standard, our deference to the agency is greatest when reviewing technical matters within its area of expertise, particularly its choice of scientific data and statistical methodology."). However, the Court is troubled by the Forest Service's failure to respond to the criticisms of two respected ornithologists who objected to the use of 10-year-old data. It is one thing to rely on data supplied by an expert even when other experts disagree; it is another thing to rely on an expert data when that very same expert criticizes the use of the data. The suspect nature of the underlying data is especially significant when taken into consideration with the evidence suggesting that the population of neotropical migratory birds has sharply declined during the last decade.
 
 
 70
 In briefing the issue as part of this Court's review, the Forest Service appears to take the position that it was proper to use 10-year-old data because no more recent information was available. However, as the plaintiffs point out, the 1986 Forest Plan for the Shawnee established certain monitoring and evaluation requirements for the Shawnee. One of the requirements was to monitor the population trends of management indicator species as a result of habitat changes. (1986 Land and Resource Management Plan at V-7.) Although the plan provided that some populations would be monitored through the use of habitat suitability models, the plan states that a number of species, including some of the neotropical migratory songbird species at issue in this case, were to be monitored annually and that the unit of measure would be "populations; Song/sight census; Point count. Road and trail census. Transect count." (1986 Land and Resource Management Plan at V-8.)
 
 
 71
 The Forest Service argues that it is monitoring neotropical populations by participating in the Partners in Flight Program, using neotropical census data developed by the Illinois Natural History Survey, and using bird census data from the United States Fish and Wildlife Breeding Bird Survey. However, if this is so, there would appear to be no reason to rely on the 10-year-old Graber data if these programs have provided more recent, and presumably more accurate, data on the existing population levels of the targeted species.
 
 
 72
 For these reasons, the Court finds that serious questions exist with respect to the scientific accuracy of the FSEIS's projections of population trends for management indicator species. Absent a rational response to the ornithologists' criticisms and an explanation for the failure to compile more recent data through the monitoring required by the 1986 Plan, the Court finds that the reliance upon the 10-year-old Graber data to be arbitrary and capricious.[10]
 
 
 73
 In a related argument, the plaintiffs have challenged the monitoring provisions set forth in the ALRMP. They contend that the ALRMP's monitoring requirements for management indicator species are inadequate because there is no provision for annual field surveys of population levels but instead appears to rely solely on HEP projections. (See ALRMP at V-5.) They argue that this level of monitoring is contrary to the requirements of the Forest Service's regulations, which provide that: "Population trends of the management indicator species will be monitored and relationships to habitat changes determined." 36 C.F.R. § 219.19(a)(6) (1992).
 
 
 74
 Based upon the abbreviated description in the ALRMP, it is uncertain exactly what type of monitoring will be conducted. The plan simply states that there will be annual monitoring based upon "[a]cres of suitable habitat and populations." (ALRMP at V-5.) This level of monitoring may be sufficient if the reference to "populations" means that the Forest Service will obtain updated estimates of the populations of the various management indicator species within the Shawnee for use in its computer habitat models. If, however, no field surveys or other means are used to obtain updated estimates, the ALRMP would provide no monitoring at all; in effect, the Forest Service would be merely recreating the HEP analysis each year based on the current acreage for each type of habitat. That type of theoretical "guesstimate" would not satisfy section 219.19(a)(6)'s mandate.
 
 
 75
 In order to monitor population trends and the relationship to habitat changes, the Forest Service must have actual data about current populations. The agency cannot rely solely on past population estimates. The Court, therefore, agrees with the plaintiffs that the ALRMP's monitoring provisions, as currently written, do not clearly provide for the type of monitoring required by the Forest Service regulations. It is the Forest Service's failure to document its monitoring activities that is arbitrary and capricious. Without such documentation and explanation, the Court cannot determine whether the monitoring activities themselves fail to comply with the regulations.
 
 3. Ensuring Viability of the Species
 
 76
 The plaintiffs argue that the ALRMP is invalid because it fails to comply with the Forest Service's mandate to ensure viability of certain forest interior species. For purposes of this lawsuit, the plaintiffs have focused mainly on the Cerulean Warbler, which is one of the neotropical migratory songbirds with special habitat needs as identified in the 1989 Robbins study.
 
 
 77
 As the plaintiffs point out, the Forest Service planning regulations provide that "[f]ish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area." 36 C.F.R. § 219.19 (1992).
 
 
 78
 For planning purposes, a viable population shall be regarded as one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed in the planning area. In order to insure that viable populations will be maintained, habitat must be provided to support, at least, a minimum number of reproductive individuals and that habitat must be well distributed so that those individuals can interact with others in the planning area.
 
 
 79
 Id. The regulation goes on to require the Forest Service to identify certain vertebrate and/or invertebrate species as management indicator species and to require that each planning alternative "shall establish objectives for the maintenance and improvement of habitat for management indicator species ... to the degree consistent with overall multiple use objectives of the alternative." 36 C.F.R. § 219.19(a) (1992); see also 36 C.F.R. § 219.27(a)(6) (1992) ("All management prescriptions shall [p]rovide for adequate fish and wildlife habitat to maintain viable populations of existing native vertebrate species and provide that habitat for species chosen under § 219.19 is maintained and improved to the degree consistent with multiple-use objectives established in the plan....").
 
 
 80
 The plaintiffs argue that the ALRMP fails to comply with this mandate because it does not provide the minimum breeding habitat for the Cerulean Warbler as identified in the 1989 Robbins study. As the plaintiffs point out, the 1989 study suggests that the minimum area for breeding for the Cerulean Warbler is 700 hectares (1,729 acres). (Pls.' Ex. at 25 (Table 5).) Because the ALRMP provides for FIMUs of about 1,100 acres in size, the plaintiffs argue that the plan does not meet the minimum breeding requirement for this management indicator species.
 
 
 81
 The Forest Service acknowledged the 1989 Robbins study when discussing the Cerulean Warbler's needs as part of the FSEIS. (FSEIS App. at H-21, I-17.) As part of its wildlife analysis, the Forest Service referred to the study's findings that the probability of detecting Cerulean Warblers is reduced by 50 percent in areas of 700 hectares in size. (FSEIS App. at H-21.) However, the FSEIS does not discuss the ramifications of this data in terms of maintaining the viability of the Cerulean Warbler, i.e., that the study suggests that the 1,100-acres FIMUs established by the ALRMP are about 630 acres smaller than required to supply the minimum breeding area for this species. Instead, the Forest Service uses its own mathematical formula, based in part on the outdated Graber data, to calculate that the ALRMP will support a minimum acceptable population level. (FSEIS App. at H-21 to H-22.)
 
 
 82
 The Court recognizes, as stated above, that the Forest Service's choice of methodology is generally left to its expertise. However, the Court finds it arbitrary and capricious to rely upon a generalized mathematical formula without at least some rational explanation as to why that method of calculating the minimum viable population is preferable to the calculations and methodology presented in the 1989 study.
 
 
 83
 Even more disturbing is the fact that the conclusions regarding Cerulean Warbler viability in the wildlife analysis and the FSEIS's environmental effects analysis are contrary to the Forest Service's statements in response to public comments about the ALRMP. For example, when asked about the size requirements set forth in the 1989 Robbins study, the Forest Service acknowledged that three species, including the Cerulean Warbler, require tracts larger than the 1,100-acre FIMUs provided for in the ALRMP. (FSEIS App. at I-19.) In response to another question, the Forest Service appears to concede that the size of its FIMUs will not support viable populations of certain species:
 
 
 84
 The current Forest Interior Management Units were developed as part of the Settlement Agreement signed by the Audubon Council of Illinois, the Illinois Department of Conservation, E. Allan Englehart and Sierra Club, et al., (1988). The boundaries were developed in cooperation with the Illinois Department of Conservation, Audubon Council of Illinois, the Illinois Natural History Survey, the Missouri Department of Conservation and the Association of Concerned Environmentalists. In many cases the boundaries of these units border on roads, private land, or other major breaks in the forest. In such cases moving these boundaries on a map would not effectively change what the organisms that use these areas experience. In other cases the boundaries could be increased some, but data presented by Robbins et al. (1989) indicates that little would be gained by doing so. They have developed a graph depicting the probability of finding a certain number of Forest Interior birds in an area of certain size. For instance, in an area of 1,100 acres (the minimum size of our forest interior management units) there is a 50% probability of detecting at least 8 species of forest interior birds. [A 50% probability of occurrence is the lowest Robbins suggests will still maintain breeding potential.] The 50% probability of detecting at least 9 species is not reached until an area is 2,322 acres in size, more than double the minimum size of our present forest interior management units. Clearly, increasing the size by even a few hundred acres gives little, if any, advantage.
 
 
 85
 (FSEIS App. at I-17.) However, in response to a comment that the FSEIS failed to demonstrate how minimum viable populations of forest interior species will be maintained, the Forest Service gave this almost schizophrenic statement:
 
 
 86
 We have revised the discussion of effects on Management Indicator Species in Chapter 4 of the FSEIS: all things remaining equal, our increases in habitat will result in increasing numbers of birds; and it is on that that we base our statement in the FSEIS. We know, though, that all things do not remain the same; factors beyond our control, and beyond our Nation's borders (severe loss of winter habitat), may make our habitat increases meaningless. We are doing what we realistically can do to help neotropical songbirds survive.
 
 
 87
 (FSEIS App. at I-19.)
 
 
 88
 Thus, while the Forest Service admits that its FIMUs are not large enough, according to the 1989 Robbins study, to provide sufficient breeding area for the Cerulean Warbler, the Forest Service makes no mention of this fact when discussing the viability of this and other forest interior species. Instead, the environmental effects analysis of the FSEIS suggests that the FIMUs "should benefit forest-interior birds by reducing the amount of edge habitat available to avian predators.... However, with the alarming rate of nest parasitiem [sic] of cowbirds occurring on the Forest, even with these areas set aside ... it is likely that neotropical migrant birds will not show any population increases." (FSEIS at 4-121.)
 
 
 89
 The failure to reconcile these inconsistencies is fatal to the FSEIS's analysis. The purpose of NEPA's EIS requirement is to ensure that federal agencies "consider every significant aspect of the environmental impact of a proposed action" and to "ensure[ ] that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, 462 U.S. 87, 97 (1983). The inconsistencies in the FSEIS make it impossible to determine whether the Forest Service is conceding or denying that its ALRMP will not provide for the viability of Cerulean Warbler because of the size of the FIMUs. As a result, the Court is unable to determine whether the agency considers its plan in compliance with the mandate of ensuring viability of management indicator species or whether the agency has justified its plan on other grounds.[11] The Court, therefore, finds that the FSEIS must be remanded to the agency to remedy this defect.
 
 
 90
 Although this conclusion resolves the issue for purposes of this lawsuit, several additional observations are in order. First, the Forest Service argues that the Sierra Club and Audubon Council agreed to 1, 100-acre FIMUs in the 1988 Settlement Agreement. However, as the Forest Service itself argues, the 1988 agreement provided that the ALRMP would be developed in compliance with NEPA and NFMA. Thus, if either of these statutes required a different result, neither the agency nor the environmental groups were bound by the guidelines set forth in the settlement agreement. Furthermore, the plaintiffs point out, and the Forest Service does not dispute, that plaintiff RACE did not sign the agreement and, therefore, is not bound by its provisions. And, finally, the language of the settlement agreement itself does not absolutely prohibit a breach; it merely provides that if one of the environmental groups appeals an issue upon which it had agreed as part of the settlement, the entire agreement was void as to that party.
 
 
 91
 Secondly, the Forest Service argues that the FIMU issue was already decided in Donham v. United States Forest Serv., No. 93-CV-4172-JPG (S.D.Ill. Jan. 24, 1995), and, therefore, the plaintiffs are collaterally estopped to relitigate it. Collateral estoppel applies, however, only when the same parties or their privies attempt to relitigate an issue. Kunzelman v. Thompson, 799 F.2d 1172, 1176 (7th Cir.1986). The prior decision involved only an individual plaintiff, Mark Donham, who was litigating his own individual claims pro se and who is not a party to this litigation. Donham is a member of RACE and courts have sometimes applied collateral estoppel where the parties are "so closely aligned that they represent the same legal interest." Id. at 1178 (citations omitted). However, the Forest Service has made no attempt whatsoever' to demonstrate such a close alignment between Donham and RACE, or any of the other plaintiffs.
 
 
 92
 More significantly, the Donham opinion resolved only a very limited issue regarding the FIMUs, i.e., whether the Forest Service violated NEPA by failing to consider an alternative that featured 7,400-acre FIMUs. This Court held that the Forest Service properly declined to consider such an alternative because there was conflicting scientific evidence as to whether 7,400-acre tracts were necessary. Indeed, the 1989 Robbins study itself does not suggest that 7,400-acre tracts are required. It states that 7,400-acre tracts provide the maximum probability of occurrence for forest interior species; the study identifies much smaller tracts as the minimum area for breeding. Thus, the Donham lawsuit involved the question of whether the Forest Service should have maximized the habitat for forest interior species. This case, on the other hand, involves the very different question of whether the Forest Service has provided the minimum requirements to ensure the viability of a management indicator species. Thus, the doctrine of collateral estoppel does not apply.
 
 4. Migratory Bird Treaty Act
 
 93
 The plaintiffs argue that the Amended Plan also violates the MBTA, which provides, in pertinent part, that it is unlawful "to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, ... any migratory bird, [or] any part, nest, or egg of any such bird" that is protected under the various migratory bird treaties to which the United States is a party. 16 U.S.C. § 703 (1988). The plaintiffs contend that an illegal "taking" or killing of migratory birds will occur because the ALRMP (1) destroys the essential habitat for neotropical migratory birds; and (2) directly kills such birds by allowing logging during neotropical bird nesting periods.
 
 
 94
 Contrary to the plaintiffs' first contention, a "taking" does not occur simply because of habitat modification or degradation. Seattle Audubon Society v. Evans, 952 F.2d 297, 302-03 (9th Cir.1991). Rather, the statute defines the term "take" as meaning to "pursue, hunt, shoot, capture, collect, kill" or to attempt any of these acts. 16 U.S.C. § 715n (1988); 50 C.F.R. § 10.12 (1994). Although a similar prohibition against "taking" in the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1543, has been construed to prohibit habitat degradation, that construction is based upon the broader definition that Congress gave to the term "take." More specifically, the ESA defines "take" to include "harm". 16 U.S.C. § 1532(19) ("[t]he term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" or to attempt any such acts); see also 50 C.F.R. § 17.3 (providing that for purposes of the ESA, the term " 'harm' ... means an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavior patterns, including breeding, feeding or sheltering.").
 
 
 95
 The recent Supreme Court decision in Babbitt v. Sweet Home Chapter of Communities for a Greater Or., 115 S.Ct. 2407 (1995), supports this result. In Babbitt, the Supreme Court held that the Secretary of the Interior's interpretation of the Endangered Species Act to include habitat modification or degradation that actually kills wildlife was a reasonable interpretation of the statute. In reaching this conclusion, the Supreme Court found it significant that the word "harm" was included. The Supreme Court stated:
 
 
 96
 The statutory context of "harm" suggests that Congress meant that term to serve a particular function in the ESA, consistent with but distinct from the functions of the other verbs used to define "take." The Secretary's interpretation of "harm" to include indirectly injuring endangered animals through habitat modification permissibly interprets "harm" to have "a character of its own not to be submerged by its association."
 
 
 97
 Id. at 2415 (quoting Russell Motor Car Co. v. United States, 261 U.S. 514, 519 (1923)). As noted above, the statutory language of the MBTA differs from the ESA in that the word harm (along with the words harass, wound, and trap) is not included. This is strong evidence that the MBTA does not include a prohibition of habitat modification or degradation.
 
 
 98
 The plaintiffs next argue that the ALRMP will result in the killing of young migratory birds because it allows logging during the nesting season. Although the ALRMP prohibits logging in FIMUs during the nesting season to protect the nesting birds, this prohibition does not apply outside the FIMUs. (Compare ALRMP at IV-147 (prohibiting surface disturbing activities in Management Prescription 6.4 areas from April 1 to July 15) with ALRMP at IV-103 to IV-106 (no seasonal prohibitions for Management Prescription 2.1 areas).) The plaintiffs argue that the Forest Service, in calculating the population levels for forest interior birds, determined that their suitable habitat would include areas outside the FIMUs in addition to the FIMUs themselves. Therefore, the plaintiffs contend that the Forest Service must have assumed that these birds would nest outside of the FIMUs as well as within them. As a result, they contend that logging outside the FIMUs during the nesting season will result in the deaths of young migratory birds.
 
 
 99
 The Forest Service has failed to respond to this argument in any meaningful way. The Forest Service's brief makes the shrill declaration that "Plaintiffs have not produced a shred of evidence that this purported taking or killing has occurred, will occur, or can occur." (Defs.' Consolidated Mem., Doc. 26, at 25 n. 11.) However, there is no attempt to respond to the plaintiffs' logical assumption that forest interior birds will be killed if they are nesting outside the FIMUs and there are no seasonal restrictions are placed on logging in these non-FIMU areas. Indeed, the Forest Service argues, with respect to another issue in its brief, that the FIMUs are not the only habitat used by these birds but, rather, that the FIMUs constitute the "largest" and the "best" neotropical bird habitat. (Defs.' Reply Brief, Doc. 36, at 4-5.) Thus, the Forest Service admits that it considers areas outside the FIMUs to be neotropical migratory bird habitat.
 
 
 100
 Based upon this discussion, the Court finds that the Forest Service has not adequately addressed the issue of whether the ALRMP will violate the MBTA by allowing logging outside the FIMUs during the nesting season. Accordingly, the Forest Service is directed to more fully address this issue upon remand.
 
 C. Artificial Openlands (Count III)
 
 101
 The plaintiffs argue that the ALRMP's provisions for creating and maintaining openland areas do not constitute a rational policy. More specifically, the plaintiffs contend that the Forest Service improperly justified its decision on the regulatory mandate requiring the Forest Service to ensure the viability of native species, including those species that prefer openland habitat. Although the plaintiffs agree that the viable population requirements apply to openland species, they contend that openland areas are abundant on the private lands surrounding the Shawnee. Therefore, they argue that the Forest Service should have taken these lands into account when projecting the populations of openland species.
 
 
 102
 The plaintiffs' argument presents a novel issue without an obvious resolution. As set forth above, section 219.19 of the Forest Service regulations require that "[f]ish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area." 36 C.F.R. § 219.19 (1992) (emphasis added). The regulations define the term "planning area" as "[t]he area of the National Forest System covered by a regional guide or forest plan." 36 C.F.R. § 219.3 (1992). The most logical interpretation of this definition is that the planning area refers to lands within the formal boundaries of a designated national forest.
 
 
 103
 The plaintiffs point out, however, that the Forest Service has defined the planning area for the Shawnee to include the private lands immediately adjacent to the forest. (FSEIS at 4-79 ("The cumulative effects analysis, then, covers all land within the proclamation boundary of the Shawnee NF, and that land immediately adjacent which could potentially be affected by Shawnee NF management, that is, the planning area.").) When discussing the viability projections for certain openland species, the Forest Service based its population projections only upon Forest Service land acreage and did not consider the private lands in the calculations. (See FSEIS App. at H-30 to H-31.) But the FSEIS acknowledged that adjacent private lands contain openland habitat that might have increased the population levels for openland species. (FSEIS App. at H-31.) The Forest Service thus concluded that while forest lands alone were not projected to maintain viable populations of two openland species, the prairie warbler and the great crested flycatcher, careful monitoring of the two species would help determine the actual population trends to ensure that viable populations are maintained. (FSEIS App. at H-31.)
 
 
 104
 In short, the Forest Service itself appears willing to consider, at least to a limited extent, the availability of suitable habitat on surrounding private lands. The Court need not determine, however, whether the Forest Service should have evaluated these lands to the extent that the plaintiffs would desire, i.e., to determine whether openland species would remain viable if no artificial openings were created within the forest itself, because the Regional Forester's decision was not based solely on the issue of maintaining viability of openland species. Rather, as pointed out in an extended discussion above, the regional forester's decision was also based upon a desire to maintain sufficient numbers of openland species on public lands for recreational purposes, such as hunting and wildlife watching, and to ensure appropriate habitat for the continuation of a program to reintroduce ruffed grouse in the Plank Hill area. Moreover, the Forest Service considered the openland habitat on surrounding lands to be inferior to that which could be maintained on the forest itself.
 
 
 105
 Thus, the Forest Service would be justified in seeking to maintain viable populations of openland species within the actual forest boundaries even if the forest regulations could be interpreted as allowing the Forest Service to consider whether surrounding private lands would provide habitat to ensure viability of openland species. The Court, therefore, rejects the plaintiffs' objections to artificial openlands, as set forth in Count III.
 
 D. Commercial Logging Program (Count IV)
 
 106
 The plaintiffs argue that the Forest Service's decision to allow logging in the Shawnee is based upon several erroneous assumptions including: (1) that commercial logging is required by law; (2) that logging in the Shawnee helps the local economy; (3) that logging of hardwoods in the Shawnee can be profitable; and (4) that logging will promote biodiversity. The fourth argument already has been discussed in relation to the artificial openlands issue above and will not be repeated here. The following analysis, therefore, will focus only on the first three arguments.
 
 
 107
 The Court agrees with the plaintiffs that the FSEIS for the ALRMP erroneously assumes that logging is required by federal statutes. (FSEIS at 2-4 to 2-5 ("Alternative 4 [the no-logging alternative] is probably a violation of the Resource Planning Act, the National Forest Management Act and the Multiple-Use Sustained Yield Act of 1960.").) The Forest Service is correct in stating that the national forests were created for multiple purposes, including timber. See MUSYA, 16 U.S.C. § 528 (1988) ("It is the policy of Congress that the National Forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes."). However, while that language indicates that timber is a permissible use of forest land, the statute does not require that every forest provide for every one of the enumerated uses. To the contrary, while NFMA directs the Forest Service to manage forests for "multiple use and sustained yield of the several products and services obtained therefrom[,]" 16 U.S.C. § 529 (1988), the statute makes it clear that "multiple use" means "the most judicious use of the land for some or all of these resources" and recognizes that "some land will be used for less than all of the resources." 16 U.S.C. § 531 (1988) (emphasis added).[12]
 
 
 108
 This defect is not fatal to the ALRMP, however, because there is no indication that Regional Forester Marita's decision was based upon this assumption. Rather, in explaining his decision, the regional forester stated:
 
 
 109
 I selected alternative 5 because it provides timber products to help supply the nation's need for quality hardwood sawtimber and veneer. The timber program will concentrate on growing and harvesting those wood products most desired by the local timber industry. I realize that some people believe no trees should be harvested from the Shawnee, while others want a much greater amount harvested. I believe timber harvest, as specified in alternative 5, is a needed and beneficial part of forest management.
 
 
 110
 The Shawnee is a National Forest whose multiple-use mission includes the production of timber products. The Shawnee, along with other National Forests, is funded by the United States Congress to produce a sustained supply of wood products. The timber program prescribed under alternative 5 is consistent with the multiple-use mission of the Forest Service and the intent of Congress.
 
 
 111
 (ROD for ALRMP at 19-20.)
 
 
 112
 These comments are consistent with a recognition that timber harvest is one of the legitimate uses for the forest, i.e., part of the forest's multiple-use mission. But there is no indication that the regional forester felt statutorily compelled to provide for timber harvest. Rather, his decision is based upon his professional opinion that timber harvest is a needed and beneficial part of forest management and, therefore, he has exercised his discretion to provide for timber harvest along with other permissible uses of the forest. (ROD for ALRMP at 20 ("I believe alternative 5 provides the best possible mix of timber, recreation, wildlife, and other outputs and uses while protecting and enhancing the basic forest resources. Neither a greater or lesser timber harvest volume would produce the best mix of resource use and environmental protection.").) That is precisely the sort of compromise that the NFMA has empowered the agency to make. See Krichbaum v. Kelley, 844 F.Supp. 1107, 1119 (W.D.Va.1994).
 
 
 113
 The plaintiffs' second argument attacks the regional forester's suggestion that timber harvest will benefit the local economy. Although the plaintiffs acknowledge that there is a general demand for timber in the local area, the plaintiffs argue that the cumulative effects analysis in the FSEIS shows that private timberland is capable of supplying that demand. Thus, they contend that the Forest Service's decision is based upon a flawed "relative values" analysis. The Court disagrees for several reasons.
 
 
 114
 First, in discussing the effects of alternative 4, the FSEIS states that "[p]rivate commercial forest lands could theoretically make up this difference since the most current data show that harvest from private land in Illinois is less than growth and since the Shawnee National Forest timber harvest has been less than 1 % of the total harvest for Illinois." (FSEIS at 4-93 (emphasis added).) Implicit in this statement is the fact that while private lands may have sufficient timber to supply commercial needs, there is no indication that private landowners are willing to sell their timber. Moreover, the FSEIS statement is based upon timber data for the entire state rather than just the localized area. Timber harvests elsewhere would not benefit the local timber industry to the same degree as harvests from the Shawnee.
 
 
 115
 Secondly, timber sales from the Shawnee also benefit the local economy through direct payments to county governments based upon a percentage of the receipts from such sales. This income would be lost if the Shawnee halted its logging program, forcing the timber industry to look elsewhere in the state for supplies. Finally, the Court notes that the regional forester's decision was not based solely upon the needs of the local area but, rather, considered the nation's demand for timber products. Thus, as explained above, the decision to allow logging in the Shawnee was based upon a proper relative values analysis.
 
 
 116
 The plaintiffs' final argument is that the Forest Service based its decision upon the erroneous assumption that commercial logging can be profitable in the Shawnee. More specifically, the plaintiffs contend that the Forest Service relied upon erroneous information in a table that set forth the costs and revenues associated with timber sale program from 1987 to 1990. (FSEIS at 3-82 (Table 3-15).) The table shows that the sale of upland hardwood timber turned a profit in all but one year during the four-year period, averaging $103.87 per thousand board feet in revenues against $90.13 in costs overall.[13] However, the plaintiffs have submitted a memorandum in which the Forest Service states that an error was made in the 1988 and 1990 figures used in this tables.[14] (Pls.' Ex. 29.) The corrected values show that the program turned a profit in 1987 and 1988 but that revenues have run below costs in every year since then. The average revenues through 1992 were $98.57 per thousand board feet as compared with $98.10 in costs.[15]
 
 
 117
 Based upon the corrected information, the plaintiffs argue that the timber sales barely broke even and the clear trend since 1988 is for such sales to lose money, with substantial losses reported in 1991 when there were $137.88 per thousand board feet in revenues against $255.40 in costs. Thus, the plaintiffs argue that the Forest Service has erroneously assumed that it has addressed the problem of below-cost sales by offering only hardwood timber as part of the commercial logging program.
 
 
 118
 It is clear that an error was made in the mathematical computations set forth in the FSEIS. However, the corrected data is still sufficient to support the regional forester's belief that the hardwood sales would address the below-cost timber sale issue. Although the hardwood sales have averaged profits of only $0.47 per thousand board feet from 1987 to 1992, these are profits nonetheless and, therefore, cannot be considered below-cost sales. Moreover, the regional forester acknowledged that even with this emphasis on hardwood sales, the timber sale program probably will not become profitable in the near future because of the extraordinary expenses for appeals, litigation, and law enforcement associated with timber sales. Thus, while the regional forester was aware that the problem was not entirely resolved, he stated that he chose alternative 5 because it "makes every effort to 'turn-around' the below-cost timber sale program on the Shawnee National Forest." (ROD for ALRMP at 20; see also ROD for ALRMP at 19 ("Under alternative 5, the timber sale program for the Shawnee National Forest could return a profit, since ... it focuses on sales of high-value hardwood sawtimber.") (emphasis added).)
 
 
 119
 This assumption is supported by the corrected figures for past hardwood sales and, therefore, the decision to continue the commercial logging program was not arbitrary or capricious. As a result, the Court rejects the plaintiffs' challenges to the timber program as stated in Count IV.
 
 E. Oil and Gas Leasing (Count V)
 
 120
 Plaintiffs challenge the oil and gas leasing in the Shawnee on four main grounds: (1) the Forest Service does not have the authority to make oil and gas leasing a priority; (2) the FSEIS is inconsistent with the Hoosier National Forest FSEIS; (3) the Forest Service failed to analyze the effects of an oil spill; and (4) there is no discussion of oil and gas leasing in the cumulative effects analysis covering fish and wildlife. The Court will address each argument in turn.
 
 
 121
 Plaintiffs' first argument is straightforward. They contend that there is no law authorizing the Forest Service to make oil and gas leasing a priority. The Forest Service counters that the Federal Onshore Oil and Gas Leasing Reform Act of 1987 ("FOOGLRA"), Pub.L. No. 100-203, 101 Stat. 1330-256 (codified at 16 U.S.C. § 3148 (1988) and scattered sections of 30 U.S.C.), and its implementing regulations, 36 C.F.R. § 228.100 et seq. (1992), direct the Forest Service to identify suitable lands for oil and gas leasing.
 
 
 122
 The plaintiffs provide no statutory authority or case law stating that the Forest Service does not have the authority to make oil and gas leasing a priority. Instead, they state, without argument, that MUSYA prevents the Forest Service from making oil and gas leasing a priority. However, there is nothing in MUSYA that prevents the Forest Service from considering oil and gas as a resource to be managed and considered along with all of the other resources in the Shawnee. Furthermore, the Forest Service has a duty under FOOGLRA to consider oil and gas leasing. Thus, there is no merit to the plaintiffs' first contention.
 
 
 123
 Plaintiffs' second contention is that the FSEIS fails to discuss the reasons why oil and gas leasing is allowed in the Shawnee when it is not allowed in the Hoosier National Forest. The plaintiffs contend that this defect is fatal because the Shawnee and the Hoosier National Forest are similar. (See FSEIS at 4-57 (adapting a analysis of the Hoosier National Forest for use in analyzing the Shawnee "because both Forests are part of the same geologic basin and are of similar ecological regimes.").) The Forest Service counters that the difference between the Hoosier National Forest and the Shawnee is that there is interest in oil and gas leasing in the Shawnee whereas in the Hoosier National Forest there is not. The plaintiffs reply that the Forest Service's rationale is a post-hoc justification that cannot be upheld by the Court.
 
 
 124
 Although the Court agrees with the plaintiffs that post-hoc justifications do not suffice, this does not mean that the analysis of oil and gas leasing in the Shawnee is insufficient. The Forest Service is required to analyze the environmental effects of oil and gas leasing. It is not necessarily required to explain why its decision in one forest differs from that in another. There are some situations, such as the all-terrain vehicles issue discussed below, where the Forest Service has information from one forest that has implications for the environmental effects on another forest. Here, however, the difference in the two plans seemed to be the interest in oil and gas leasing in the Shawnee as compared to almost complete opposition in the Hoosier National Forest. Admittedly, this explanation is not in the FSEIS, but rather in the Forest Service's brief. Nevertheless, although this is a post-hoc rationalization, the Court does not believe that the Forest Service must document why its decision in one forest is different from another forest unless there is environmental information developed with respect to one forest that has a bearing on the other forest. Therefore, since the difference here is based on public support (or the lack thereof), rather than on environmental effects, the Court does not believe that it was arbitrary and capricious for the Forest Service to omit discussing the Hoosier National Forest in the FSEIS with respect to the oil and gas leasing.
 
 
 125
 The plaintiffs' third contention is that the FSEIS is deficient because the Forest Service does not discuss the environmental effects of an oil spill. It is true that the Forest Service does not discuss the effects of an oil spill in the FSEIS. However, the FSEIS does contain a general discussion of the possibility of a spill, stating:
 
 
 126
 In addition, long experience with oil and gas production on federal leases has demonstrated that accidental discharge of contaminants from drill sites or production facilities is extremely rare. For example: according to BLM [Bureau of Land Management] records, of the 98 wells drilled on federal leases in the Northeastern Region over the last five years, only one has experienced such a release (on Department of Defense land); it was small (about 10 barrels of oil), contained in the designed facility, and stopped quickly; no water was contaminated. It was caused when oil-haulers went on strike and one of the storage tanks over-flowed before the operator could shut-in the well.
 
 
 127
 (FSEIS at 4-62.) Based on this paragraph, the fact that oil and gas leasing will take place on only 10-20 acres of the Shawnee, and the fact that the mitigating measures are discussed, the Forest Service contends that the effects of an oil spill have been discussed.
 
 
 128
 Contrary to the Forest Service's assertion, however, the actual effect of an oil spill has not been discussed. What the Forest Service has done is: (1) explain that an oil spill is unlikely; (2) explain that the oil and gas leasing will take place only on a small portion of the Shawnee; and (3) explain the steps that are taken to minimize the damage to the environment. However, none of these explanations analyzes the consequences if an oil spill were in fact to occur.
 
 
 129
 The Forest Service goes on to make two arguments as to why it need not discuss the effects of an oil spill. First, it contends, citing to Metropolitan Edison Co. v. People Against Nuclear Energy, 460 U.S. 766, 774 (1983), that the plaintiffs have not shown that the effects of an oil spill are in a reasonable chain of causation. Second, it contends that analyzing the effects of an oil spill is not necessary at the forest plan level because the effects of a spill will be discussed with respect to specific projects.
 
 
 130
 The Forest Service's first justification is without merit. In Metropolitan Edison, the Court held that the National Regulatory Commission need not consider the psychological effect on residents of reopening the Three Mile Island nuclear plant. Id. at 778. In reaching this holding, the Court stated, "NEPA does not require the agency to assess every impact or effect of its proposed action, but only the impact or effect on the environment." Id. at 772. Thus, the Court was concerned with expanding the NEPA analysis ad infinitum beyond the effects on the environment. Here, however, the plaintiffs do not argue that the Forest Service failed to analyze some far-removed effect. Instead, they argue that the Forest Service failed to consider the effect of an oil spill on the environment. This is precisely the type of analysis mandated by NEPA and its implementing regulations.
 
 
 131
 The Forest Service's second justification, while having a surface appeal, is unavailing as well. The regulations implementing NEPA authorize the use of tiering. See 40 C.F.R. § 1502.20 (1992); 40 C.F.R. § 1508.28 (1992). Tiering allows the Forest Service to undertake a broad analysis at the forest plan level and to analyze the specifics when an EIS or an Environmental Assessment ("EA") is prepared for a specific project.
 
 
 132
 What the Forest Service has done here is not to tier but to omit. The Forest Service does not provide a broad, generalized discussion of the effects of an oil spill in the FSEIS. Rather, the Forest Service does not discuss the effects at all. The Court agrees with the Forest Service that it may wait until specific projects are proposed before providing a detailed analysis. However, this does not absolve the Forest Service from discussing the general effects of an oil spill in the FSEIS.
 
 
 133
 The Forest Service makes the contention that "oil spill risk analysis at the leasing stage is usually speculative, and any deficiencies in the analysis 'at the lease sale stage are unlikely to result in environmental damage, as a lease sale does not directly mandate further activity that would raise an oil spill problem.' " (Consolidated Mem. (Doc. 26) at 43-44 (quoting Tribal Village of Akutan v. Hodel, 869 F.2d 1185, 1992 (9th Cir.1988)).) What the Forest Service does not state is that the internal quotation above was part of a discussion on the use of incomplete or speculative data. The Akutan case involved a situation where the Secretary of the Interior had discussed the effects of an oil spill, and the plaintiffs challenged the methodology and information used. Id. Thus, it does not stand for the proposition that an analysis of the effects of an oil spill is not required at the forest plan level. Rather, it stands for the proposition that such an analysis need not follow a particular methodology or contain a discussion of every assumption underlying a particular methodology. Id. Therefore, the Court finds that the Forest Service acted arbitrarily and capriciously in failing to conduct at least a general analysis of the effects of an oil spill in the FSEIS.
 
 
 134
 The plaintiffs' final argument with respect to the oil and gas leasing is that the portion of the cumulative effects analysis discussing fish and wildlife does not mention oil and gas leasing at all. The Forest Service does not respond to this argument, either assuming that its argument as presented above would suffice, or perhaps because the portion of the cumulative effects analysis dealing with wildlife does not, in fact, mention oil and gas leasing. Suffice it to say that the Court's reasoning as detailed in part II.B.2 applies to this omission. The cumulative effects analysis is supposed to be precisely that, namely, an analysis of the effect of all the activities contemplated for the Shawnee taken as a whole. Obviously, this type of analysis requires that the Forest Service take all the activities, including oil and gas leasing, into account. The failure to consider oil and gas leasing in the discussion of the cumulative effects on fish and wildlife is arbitrary and capricious.
 
 F. All-Terrain Vehicles (Count VI)
 
 135
 The plaintiffs' challenge to the ALRMP's provisions for all-terrain vehicle and off-highway motorcycle ("ATV/OHM") use focuses mainly on the environmental analysis used to support this decision. The plaintiffs argue that the Forest Service has failed to discuss the experiences that other national forests have had after authorizing ATV/OHM use. They further contend that the Forest Service should have conducted a site-specific analysis for the ATV/OHM corridors that have been identified in the ALRMP.
 
 
 136
 The Court's review of the FSEIS shows that the Forest Service has conducted a fairly comprehensive assessment of the environmental effects of allowing ATV/OHM use on the forest in general. (See FSEIS at 3-13 to 3-15, 4-46 to 4-51.) The Forest Service was aware that ATV/OHM use could have an adverse effect on soils, but stated that these effects "can be mitigated by route design, hardening the trail with gravel or other material, prohibiting use during wet periods or freeze-thaw cycles, installing drainage structures, and other actions." (FSEIS at 4-46 to 4-47.) The Forest Service also was aware that some fish and wildlife could be adversely affected by damage to habitat and through the indirect disturbance caused by noise and presence of such human activity. (FSEIS at 449 to 4-50.) Here again, however, the Forest Service noted that there are opportunities to mitigate human disturbances. (FSEIS at 4-50 to 4-51.) Moreover, it is significant to note that in identifying ATV/OHM corridors, the Forest Service was careful to prohibit such use in sensitive areas such as forest interior management units and wilderness areas. (FSEIS at 4-50 to 4-51.)
 
 
 137
 The plaintiffs argue that the ALRMP's designation of ATV corridors is a site-specific decision that requires a site-specific analysis of the environmental consequences. To the contrary, the Forest Service properly points out that designation of ATV corridors is purely a zoning decision, just as with other aspects of the ALRMP. In other words, the ALRMP simply identifies particular areas of the forest as generally suitable for ATV use; site-specific decisions will be made at a later date when actual trails are designated. This two-step process and the Forest Service's NEPA obligations at each stage have been described as follows:
 
 
 138
 First, the agency develops a Forest Plan to establish management goals on a forest-wide basis. Forest Plans may include proposals for specific logging projects and otherwise set management goals for particular regions of the forest. Implementation of the development strategies outlined in Forest Plans occurs at the second stage, in which the Forest Supervisor proposes individual, site-specific projects in accordance with the programmatic Forest Plan.... In order to satisfy its obligations under NEPA, the Forest Service prepares an EIS in connection with each Forest Plan to evaluate the forest-wide environmental effects of the management scheme outlined in the Plan.... At the implementation stage, the agency either prepares a second, site-specific EIS, or, in an [environmental assessment], makes a finding that the individual project will have no significant environmental impact beyond that discussed in the Forest Plan EIS.
 
 
 139
 Smith v. United States Forest Serv., 33 F.3d 1072, 1074-75 (9th Cir.1994) (citations omitted).
 
 
 140
 Because the ALRMP is programmatic in nature, the accompanying FSEIS was required only to consider the forestwide environmental effects of allowing ATV usage within particular corridors. That inquiry obviously must attempt to assess the environmental consequences for the general location or management area in which the ATV corridors are proposed, which the FSEIS has attempted to do. The Forest Service need not, however, conduct a site-specific assessment until it designates actual trails.[16]
 
 
 141
 The plaintiffs' other objection has considerable merit. As part of its analysis, the FSEIS stated that other agencies that have authorized ATV//OHM use "report few problems with use outside the authorized areas or criminal activity associated with ATV/OHM use." (FSEIS at 3-15.) However, the Court has been unable to find any evidence in the record to support this conclusory statement and, in fact, one document of record suggests that the Land Between the Lakes has experienced serious problems. (Administrative R., Doc. 88p.)
 
 
 142
 The Land Between the Lakes (LBL) Off-Road Vehicle (ORV) Area has experienced a dramatic increase in use in recent years. As use of the area has increased, so have the problems which must be addressed, or the area will be closed. Many ORV users disregard our boundaries, litter, vandalize, and drive their machines through cemeteries. Excessive use of alcohol and disruptive behavior of a few have caused some ORV users, particularly families, to avoid the area.
 
 
 143
 (Administrative R., Doc. 88p.) As a result, Land Between the Lakes officials were forced to enact special enforcement measures.
 
 
 144
 The Forest Service's failure to acknowledge the Land Between the Lakes experience is especially troublesome in light of the Shawnee National Forest's historic difficulties with enforcing ATV prohibitions. The FSEIS notes that prior to adoption of the ALRMP, ATV use was authorized on a 1.4-mile route but the route "is not used much because most users do not find it challenging." (FSEIS at 3-13.) As a result, riders have gone in search of more exciting terrain elsewhere in the Shawnee with damaging consequences. (FSEIS at 3-13 (stating that "hill-climbs over sensitive or shallow soils are resulting in erosion of the slopes; operation of ATV/OHMs in stream channels or along banks and levees is resulting in sedimentation and damage to aquatic habitats; and conflicts with other Forest visitors are reported when ATV/OHMs are used on roads and trails.").) Riders also have used the county, township, and forest roads within the Shawnee. (FSEIS at 3-15.) The Forest Service notes that "[a]ll of this use is currently illegal, but the number of riders and those demanding to be permitted this activity is overwhelming...." (FSEIS at 3-15.) Although Forest Officers have issued citations for illegal ATV use on forest lands, they cannot interfere with riders on private lands or on county, township, and forest roads open to public motorized use. (FSEIS at 3-15.)
 
 
 145
 The regional forester responded to concerns about user conflicts and environmental effects by emphasizing that the ALRMP would limit ATV/OHM use "only to those roads or trails that have been specifically designated. Cross-country use is prohibited and there are strong standards and guidelines to protect the environment and reduce user conflicts." (ROD for ALRMP at 18.) He further stated that the ALRMP "includes specific monitoring and enforcement guidelines to assure compliance with the rules and prompt action if environmental damage occurs." (ROD for ALRMP at 18.) A review of the monitoring and enforcement plan finds that there are, indeed, strong guidelines for monitoring the impacts of ATV/OHM use and taking action, including closure of the trail, where considerable adverse effects are detected. However, the provisions for enforcement of the ATV/OHM regulations is minimal. (ALRMP at IV-28 to IV-29, App.H.) While the plan notes that ATV/OHM travel outside the designated trails is "of great concern[,]" there is no attempt to identify specific enforcement efforts to address this problem or to explain why the Forest Service expects to be successful in restricting travel to the designated trails when its past efforts have been unsuccessful.
 
 
 146
 The failure to acknowledge the problems at Land Between the Lakes and to provide a meaningful analysis of the Forest Service's plans to enforce its trail regulations is of great significance in this case because the FSEIS's environmental analysis is based largely upon the assumption that ATV/OHM users will abide by the regulations, i.e., the analysis anticipates only the environmental consequences from use on the designated trails. For example, the FSEIS states that adoption of alternatives 2, 3, or 5 "would result in negligible impacts to water quality" because of the way that the routes will be designed. (FSEIS at 4-47.) If the Forest Service is unsuccessful in enforcing its trail regulations, however, the environmental impacts obviously would be greater.
 
 
 147
 In short, FSEIS fails to discuss the likelihood of keeping ATV/OHM users on designated trails or, in the alternative, what the increased environmental effects will be due to an inability to keep such users on the trails. Moreover, although the FSEIS mentions that the Hoosier National Forest in Indiana has refused to authorize ATV use within its boundaries, there is no attempt to explain why the Forest Service considers the Shawnee to be suitable for this type of recreation when the Hoosier is not.
 
 
 148
 Based upon the deficiencies discussed above, the Court finds that the environmental analysis fails to comply with NEPA. The Court, therefore, rules in favor of the plaintiffs on Count VI of the complaint and concludes that the FSEIS must be remanded for further consideration by the Forest Service.
 
 
 149
 The Court emphasizes, however, that this decision does not in any way suggest that the Forest Service should not attempt to provide this type of recreation in the Shawnee. To the contrary, the Forest Service has established a laudable goal of attempting to reach a compromise among competing recreational interests by providing a mix of opportunities in the Shawnee. (ROD for ALRMP at 18.) The Court also agrees with the Forest Service's observation that "the vast majority of people that have actively supported ATV/OHM use on the Shawnee National Forest are rational people more than willing to comply with rational laws and regulations." (FSEIS at 3-15.) Thus, the order of remand is not meant to suggest that the Forest Service has reached the wrong decision; rather, the case is remanded only to ensure that the Forest Service reaches its decision after being fully informed of the environmental facts.
 
 
 150
 G. Wilderness Study for Burke Branch (Count VII)
 
 
 151
 The plaintiffs argue that the Forest Service has violated the 1988 Settlement Agreement by failing to designate the Burke Branch area for wilderness study as provided in the agreement. Although the ALRMP offers several explanations for deciding against this designation, the plaintiffs argue that all of these explanations are based upon information that was known at the time that the Forest Service entered into the agreement. Thus, the plaintiffs argue that at the very minimum, the Forest Service should have explained why it found those explanations more persuasive when adopting the ALRMP than when it entered into the Settlement Agreement in 1988.
 
 
 152
 The Forest Service admits that it agreed, as part of the 1988 settlement, to designate Burke Branch for wilderness study but states that this agreement was subject to further review pursuant to the NFMA and NEPA. (Appeal Settlement Agreement at 2 (stating that "[a]ny amendments or changes to the Forest plan ... will be carried out through the proper procedures in accordance with the requirements of the National Forest Management Act (NFMA) and the National Environmental Policy Act (NEPA), and other appropriate laws and regulations.").) After completing the environmental analysis set forth in the FSEIS, the regional forester ultimately determined that "Burke Branch is not a good candidate for Wilderness, because its characteristics are better suited for other uses, including a management of natural openland ecosystems, mineral production, and motorized recreation." (ROD for ALRMP at 22.)
 
 
 153
 Because the 1988 Settlement Agreement was conditioned upon compliance with NEPA and the NFMA, the Court finds that the Forest Service did not violate the agreement when it decided against wilderness study for Burke Branch based upon the findings in the FSEIS. For the same reason, it cannot be said that the Forest Service's change of heart was arbitrary or capricious. To the contrary, the regional forester has provided several rational justifications that have a sound basis in the FSEIS:
 
 
 154
 This area has a dense system of improved and unimproved roads that make the area more suitable for motorized recreation use than Wilderness. The need for extensive burning, shade removal, and other vegetative management within Research Natural Areas, natural areas, and natural openland ecosystems at Burke Branch conflict with Wilderness management. Over 23 percent of the Burke Branch area is nonnative pine plantations. This pine and the extensive road system is not consistent with the natural appearance desired within Wilderness. Burke Branch also has high potential for the mineral Fluorspar. Fluorspar is classified as being of compelling domestic significance by the U.S. Bureau of Mines and production of fluorspar is important to the local economy.
 
 
 155
 (ROD for ALRMP at 21; see also FSEIS App. at C-3 to C-11.) Although the majority of this information may have been known at the time that the Forest Service entered into the 1988 Settlement Agreement, there is no indication that the agency had given such information the "hard look" that an EIS is designed to provide. Thus the Forest Service cannot be faulted for changing its opinion after making the thorough and comprehensive analysis required by NEPA.
 
 
 156
 Moreover, the 1988 Settlement Agreement provides its own remedy, stating that if the Forest Service failed to amend the Forest Plan as provided in the agreement, "that portion of the Agreement not enacted as provided herein shall be null and void and all obligations under it discharged, and all rights of any party to appeal or seek judicial review ... remain as they were on the effective date of this Agreement." (Appeal Settlement Agreement at 26.) Thus, the plaintiffs' recourse is to challenge that portion of the ALRMP as if there were no Settlement Agreement, i.e., they must demonstrate that the Forest Service's reasons for refusing to designate Burke Branch for wilderness study were arbitrary and capricious. They have not done so.
 
 
 157
 The plaintiffs argue that many of the perceived obstacles to wilderness designation can be overcome or overlooked. For example, they argue that Burke Branch has no more pines or road systems than other areas in the Shawnee that Congress has already designated as wilderness. They also argue that any bill designating the area as wilderness could have provisions that would allow the Forest Service to conduct restoration activities in the unique natural areas within Burke Branch and allow limited fluorspar mining, as prior bills have allowed with other wilderness areas. (FSEIS App. at C-11.) However, as the FSEIS points out, the prior wilderness designation bills have allowed for limited activities such as prescribed fire and herbicides. Restoration of the unique barrens natural areas within Burke Branch, on the other hand, will require intensive use of heavy equipment. (FSEIS App. at C-11.) Moreover, even assuming that any one of these impediments could be overcome or overlooked, the Forest Service was within its discretion to conclude that the combination of impediments made the area as a whole unsuitable for wilderness.
 
 
 158
 For there reasons, the Court finds that the regional forester's decision was well-reasoned and soundly supported by the environmental analysis. The Court, therefore, rejects the plaintiffs' objections to the Burke Branch decision as stated in Count VII.
 
 
 159
 H. Cumulative Effects Analysis in the FSEIS (Count VIH)
 
 
 160
 The issues raised in this count of plaintiffs' complaint have been addressed in parts II.B.2 and II.E. As noted above, the Forest Service's cumulative effects analysis merely lists the individual effects of each contemplated activity on the environment without engaging in an analysis of the effects of all those projects taken as a whole. Furthermore, oil and gas leasing is not discussed with respect to fish and wildlife, and the effects of ATV/OHM trails are mentioned only in passing. For these reasons, the Court finds that the cumulative effects analysis in the FSEIS is insufficient and must be remanded to the Forest Service.[17]
 
 I. Ecological Restoration (Count IX)
 
 161
 The plaintiffs' final challenge relates to the ecological restoration program adopted in the ALRMP. The program is designed to restore the natural hardwood ecosystems that once existed in the region now encompassed by the Shawnee National Forest by eliminating some of the existing pine plantations in parts of the forest and replacing them with hardwoods.[18] In other areas, the existing pine plantations will be allowed to naturally regenerate to a hardwood/pine mix. The plaintiffs contend that the program is nothing but a change in labels that will allow the Forest Service to continue its commerical logging efforts while avoiding criticism of below-cost sales. As plaintiffs state in their brief:
 
 
 162
 By simply relabeling the pine and pin oak logging as ecological restoration and habitat improvement, the Forest Service is able to claim that it has substantially reduced the total acreage available for timber production and annual timber production, that it has replaced even-aged management as the predominant logging method, and that it has "addressed" the issue of below-cost timber sales.... However, thousands of acres of pine and pin oak will still be logged each year, that logging will use even-aged management techniques, and the Forest Service will still lose millions of dollars on these timber sales.
 
 
 163
 (Pls.' Mem. (Doc. 20) at 40-41.) The plaintiffs contend that this "exercise in form over substance" fails to comply with the Forest Service's obligations under NEPA "to fully inform the public" about the agency's decision and its obligations under the APA to give valid, supportable reasons for its decisions.
 
 
 164
 This argument was already considered, and rejected, in Glisson v. United States Forest Serv., No. 92-CV-4205-JLF (S.D.Ill. Aug. 24, 1993), where plaintiff Glisson contended that the ecological restoration program was merely a "subterfuge" to allow continued pine harvest and to circumvent the public's objections to below-cost sales. Here, as in Glisson, the Court finds nothing misleading in the FSEIS or the record of decision. Both documents make it clear that the Forest Service will be harvesting as much as 5.4 million board feet of pine each year as part of a program to restore the native hardwood forest. (ROD for ALRMP at 6; FSEIS at 2-28.) It is equally clear from the FSEIS that the costs of removing the pine plantations will exceed any revenues from the sale of that pine. (FSEIS at 2-59, 3-82 (Table 3-15); Pls.' Ex. 29.) Therefore, it should be obvious to the average reader that the ecological restoration program is going to cost money rather than make money.
 
 
 165
 This does not constitute the usual "below-cost" sales problem, however, because the pine is not being cut for commercial timber purposes but, rather, is being harvested as a means of forest management. In other words, the Forest Service is not simply cutting and selling the pine for the sake of cutting and selling pine; instead, the pine harvest is intended to benefit the forest itself by restoring its natural ecosystems. As a result, the pine harvest will be paid for as part of the Shawnee's ecology program rather than as a cost of timber production. (FSEIS at 2-59.) Although the plaintiffs may disagree with the goals of the ecological restoration program, the Forest Service was well within its discretion to adopt such a program as part of the management plan for the Shawnee and it has not violated either NEPA or the APA by reordering its priorities in this manner.
 
 
 166
 The plaintiffs also argue that the ecological restoration program fails to comply with section 219.27(g) of the forest regulations, which provides that a "planned type conversion"--i.e., a change in the diversity of plant and animal communities and tree species--"shall be justified by an analysis showing biological, economic, social, and environmental design consequences, and the relation of such conversions to the process of natural change." 36 C.F.R. § 219.27(g) (1992). This argument also was rejected in the Glisson decision, which held that the environmental analysis in the FSEIS addressed all of the elements required under section 219.27(g) and, based upon that analysis, the Forest Service determined that the ecological restoration program would provide a long-term benefit to the forest. That same analysis is applicable here. The record of decision and FSEIS make it clear that the regional forester was well aware of the costs of removing the non-native pines from the forest. He ultimately decided in favor of the program because "[i]n some areas of the Forest, there is a critical need to remove pines. Failure to eliminate pine plantations that are adjacent to natural areas, where pine seedlings are invading into the natural plant communities, would significantly harm diversity of the Forest." (ROD for ALRMP at 17.) Thus, it is clear that the regional forester concluded that the benefits of the ecological restoration program outweighed its costs.[19]
 
 
 167
 The Court, therefore, finds that the Forest Service has sufficiently justified the type conversion from pine plantations to hardwoods. Accordingly, the Court rejects the plaintiffs' claims alleged in Count IX of their complaint.
 
 III. PROPRIETY OF INJUNCTIVE RELIEF
 
 168
 As a remedy for the violations detailed above, plaintiffs seek an injunction. However, the plaintiffs do not give details as to the scope of the injunction sought. They do not explain, for example, whether they want all activities in the Shawnee halted until a new record of decision can be made. Nor do they attempt to outline the projects affected by an injunction as compared to those that may proceed, if any.
 
 
 169
 Likewise, the Forest Service's treatment of the issue is unhelpful. The Forest Service argues that the plaintiffs cannot show irreparable harm because the ALRMP does not implement specific projects. However, the Seventh Circuit rejected this argument in Sierra Club. 46 F.3d at 611-14. In rejecting this argument, the Seventh Circuit noted that a forest management plan guides all activities within the forest. Id. at 611; see also 36 C.F.R. § 219.1(b) (1992). Furthermore, the Seventh Circuit stated that:
 
 
 170
 Once the plan has passed administrative review, the procedural injury has been inflicted. Unless a plaintiff's purported interest in the matter is wholly speculative, waiting any longer to address that injury makes little sense. Indeed, if the Sierra Club had to wait until the project level to address general procedural inquiries regarding a broad issue like biological diversity, implementation of the forest plan might have progressed too far to permit proper redress.
 
 
 171
 Id. at 612. Thus, Sierra Club indicates that plaintiffs have made a showing of imminent harm.
 
 
 172
 The Forest Service makes an additional argument. It argues that it, along with the public, will be harmed to a greater extent than the plaintiffs if an injunction is issued. Specifically, the Forest Service contends that issuing an injunction would imperil its plans to improve neotropical bird habitat and forestall the deterioration and related decline of native oak trees. However, the Forest Service provides no evidence to back these conclusory statements.
 
 
 173
 Based on the lack of information, the Court is not in the position to rule on the propriety of an injunction or the scope of such an injunction if one is issued. Therefore, the Court will hold a hearing on the request for an injunction on October 18, 1995, at 3:00 p.m. in Benton. At this hearing, the Forest Service should bring a list of all projects authorized under the ALRMP that have not yet been completed. Furthermore, all the parties should be prepared to discuss whether the invalidation of the ALRMP requires the injunction of all pending projects authorized by the ALRMP or just certain projects. Lastly, the parties should meet prior to the hearing to discuss whether an agreement regarding the scope of the injunction, if one is issued, can be reached.
 
 IV. CONCLUSION
 
 174
 For the foregoing reasons, the Court hereby DENIES the plaintiff's Motion to Strike [Doc. 37]. The cross-motions for summary judgment [Doc. Nos. 19, 25] are GRANTED IN PART and DENIED IN PART. The Court finds in favor of the Forest Service on Counts I, III, IV, VII and IX of the complaint and in favor of the plaintiffs on Counts II, V, VI, and VIII. The Record of Decision for the Amended Land and Resource Management Plan issued on March 23, 1992, the Record of Decision for the Oil and Gas Leasing issued on March 23, 1992, the Final Supplemental Environmental Impact Statement and the Amended Land and Resource Management Plan are VACATED and REMANDED to the Forest Service for proceedings not inconsistent with this opinion.
 
 
 175
 IT IS SO ORDERED.
 
 MEMORANDUM AND ORDER
 
 176
 Filed March 20, 1996.
 
 GILBERT, Chief Judge:
 
 177
 On September 25, 1995, this Court issued a Memorandum and Order that found various portions of the Amended Land and Resource Management Plan ("ALRMP") for the Shawnee National Forest ("Shawnee") invalid. The instant Memorandum and Order assumes that the reader is familiar with the facts and issues discussed therein. On December 7, 1995, the plaintiffs made a motion for injunctive relief [Doc. 47] based on the rulings made in the September 25, 1995, Memorandum and Order. After briefing was completed, this Court held a hearing on February 16, 1996, concerning the propriety and scope of injunctive relief. This Memorandum and Order constitutes this Court's findings of fact and conclusions of law on the propriety and scope of injunctive relief.
 
 
 178
 The Court's turns first to the defendants' contention that no injunctive relief whatsoever is warranted. Defendants note, correctly, that a district court is not "mechanically obligated to grant an injunction for every violation of law." Weinberger v. Romero-Barcelo, 456 U.S. 305, 313 (1982). Rather, the district court "balances the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction." Id. at 312 (quoting Yakus v. United States, 321 U.S. 414, 440 (1944)). Thus, although the defendants' argue that an injunction is not appropriate because only a statutory violation is involved, the Court concludes that an injunction may be warranted where the plaintiffs' can show that the injuries resulting from not granting the injunction outweigh the injuries resulting from the grant of an injunction.
 
 
 179
 Nevertheless, although the Court rejects the extreme position taken by the defendants, it does not follow that the Court adopts the extreme position taken by the plaintiffs. The plaintiffs have argued, both in their briefs and at the hearing, that they are automatically entitled to an injunction based on their showing of irreparable injury. In support of this argument, they cite to Sierra Club v. Marita, 46 F.3d 606 (7th Cir.1995). In Marita, the Seventh Circuit held that the Sierra Club had standing to challenge a forest plan. Id. at 611-14. In reaching this conclusion, the Seventh Circuit noted that a forest management plan guides all activities within the forest. Id. at 611; see also 36 C.F.R. § 219.1(b) (1992). Furthermore, the Seventh Circuit stated that:
 
 
 180
 Once the plan has passed administrative review, the procedural injury has been inflicted. Unless a plaintiffs purported interest in the matter is wholly speculative, waiting any longer to address that injury makes little sense. Indeed, if the Sierra Club had to wait until the project level to address general procedural inquiries regarding a broad issue like biological diversity, implementation of the forest plan might have progressed too far to permit proper redress.
 
 
 181
 Id. at 612. The plaintiffs argue that the standing inquiry conducted in Marita and the injunction inquiry are the same, that is, they argue that a showing sufficient for standing purposes in also sufficient to support an injunction. Defendants counter that Marita is a case that is limited to the issue of standing and has no bearing on the propriety of injunctive relief.
 
 
 182
 The Court does not agree with either position. Although the Court agrees with the defendants that the analysis in Marita concerned the standing issue, the Court believes that certain language in Marita, namely that "implementation of the forest plan might have progressed too far to permit proper redress," indicates that in some circumstances injunctive relief may be warranted to prevent harm that will occur if project decisions are made based on an invalid forest plan. Cf. Cronin v. U.S. Dep't of Agriculture, 919 F.2d 439, 445 (7th Cir.1990) (irreparable harm caused by implementation of project). However, the plaintiffs position ignores the fact that although irreparable harm may occur from the implementation of a deficient forest plan, irreparable harm may occur from enjoining certain activities, that is, plaintiffs' position ignores the balancing of the injuries required in deciding whether injunctive relief is appropriate.
 
 
 183
 Two additional reasons support the argument that injunctive relief need not await the actual implementation of specific projects but may instead be based on deficiencies in the forest plan. One is that a contrary result would require this Court to maintain a constant role overseeing the management of the Shawnee, a role that this Court is unequipped to fill, and one which would be an unwarranted intrusion upon the prerogative of the United States Forest Service to manage the Shawnee. Cf. Missouri v. Jenkins, 115 S.Ct. 2038, 2054-55 (1995) (finding that district court abused its discretion in fashioning injunctive relief that went beyond remedying injury and in effect substituted district court in place of school board as party charged to operate schools); Association of Community Organizations for Reform Now v. Edgar ("ACORN"), 56 F.3d 791, 797-98 (7th Cir.1995) (cautioning district courts to be aware of limitations on their power to award broad injunction).
 
 
 184
 At first glance, it might be difficult to see how granting an injunction at the present time rather than later would be less of an intrusion on the defendants than to await later developments. However, two points raised by the defendants at the hearing support this conclusion. One of the arguments presented by the defendants at the hearing was that no injunctive relief was needed at the present time because they would bring any proposed projects, and the corresponding analysis, to the Court's attention when the specific project was proposed. The Court rejects such a proposal for two reasons. First, this Court does not give advisory opinions, and asking the Court to "approve" a project absent a legal challenge to that project is asking for just the sort of intermeddling with the operations of a co-equal branch of government that the restriction of federal court power to "cases or controversies" was designed to avoid. Second, the proposal invites the kind of "protracted federal judicial supervision" that a court should consider only as a last resort. ACORN, 56 F.3d at 798.
 
 
 185
 The second reason point raised at the hearing that counsels for injunctive relief now instead of later is that allowing the defendants to proceed with making commitments to third parties may cause the third parties to commit energy and resources to a project which is doomed to be enjoined because it is based on an invalid plan. Two examples include commercial logging and oil and gas leasing. At the hearing, the defendants represented to the Court that no logging contracts have been awarded, and no oil and gas development is contemplated in the near future. If the defendants were allowed to proceed on such projects, then the injunctive stakes would be needlessly increased due to the expectations and commitments of third parties who invest time and resources under the assumption that the projects will take place as scheduled.
 
 
 186
 One additional reason supports a decision to consider injunctive relief now with respect to certain activities instead of waiting for site-specific decisions is the fact that all the information necessary to decide whether an injunction is warranted is available now. For example, with respect to commercial logging, oil and gas leasing, and All-Terrain Vehicle/Off-Highway Motorcycle ("ATV/OHM") use, it is clear that the issuance of an injunction will not cause an irreparable harm to the defendants or to third parties. It is equally clear that any project involving ATV/OHM use, oil and gas leasing, and commercial logging (due to the invalid cumulative effects analysis), is illegal. The only variable left is the balancing of the injuries. However, with respect to the aforementioned projects, the balancing of the injuries is not a variable because the plaintiffs have shown an irreparable harm to themselves and to the environment if these projects are undertaken, whereas the defendants have not, and cannot, show irreparable harm resulting from waiting to proceed on such projects. See Cronin, 919 F.2d at 445 (noting that irreparable harm from proceeding with tree harvest outweighs "purely pecuniary" loss that may result from delay). Further, as noted above, issuing the injunction now instead of later prevents potential harm to third parties who might expend time and resources on a project that is doomed to be enjoined.
 
 
 187
 Nevertheless, with respect to openland management, ecological restoration, and other projects not mentioned above, the defendants have shown that the environment may be irreparably harmed by not proceeding with the projects. Plaintiffs argue to the Court that they are automatically entitled to an injunction with respect to these projects because irreparable harm may result from the projects. However, plaintiffs have not attempted to show that the harm from proceeding on the projects is greater that the harm that will occur, both to plant and animal life, if the defendants are prevented from implementing these projects. Accordingly, the Court will not enjoin those projects.
 
 
 188
 Finally, the Court notes once again that the rulings in this case are not based on the Court's agreement or disagreement with the decisions made by the defendants in their management of the Shawnee. As stated time and time again, "NEPA merely prohibits uninformed--rather than unwise--agency action." Sierra Club v. Espy, 38 F.3d 792, 802 (5th Cir.1994). The defendants have the very difficult job of balancing the competing interests in managing the Shawnee. Unfortunately for them, the Shawnee happens to be a hotbed of controversy such that any decision they make will subject them to criticism from one or more interest groups. Louise Odegaard, supervisor of the Shawnee, testified that the development of the ALRMP involved more public participation and input than any other forest plan in the history of the United States Forest Service. Hopefully, this level of participation will continue, and the Shawnee will benefit as a result.
 
 
 189
 For the reasons stated, the motion for injunctive relief [Doc. 47] is GRANTED IN PART and DENIED IN PART. An injunctive order will be issued in conformity with this Memorandum and Order.
 
 
 190
 IT IS SO ORDERED.
 
 
 
 [1]
 The Court also notes that the defendants have objected to the plaintiffs' exhibits as being outside the administrative record. However, most of the exhibits are merely duplicates of documents that were already part of the administrative record. To the extent that the Court has relied upon exhibits outside the record, the reasons for doing so are discussed below in conjunction with the specific exhibit
 
 
 [2]
 The Association of Concerned Environmentalists, predecessor to the Regional Association of Concerned Environmentalists, also was involved in the settlement discussions. The plaintiffs allege that ACE did not sign the document. However, the agreement contains the signature of James Benson, chair of the Shawnee Appeal Committee, who purportedly signed "for" ACE and several other organizations
 
 
 [3]
 Thus it is not inconsistent for Regional Forester Marita, in adopting a plan for the Hoosier National Forest in Indiana, to base his decision in part upon the fact that "National Forest System lands provide many benefits that cannot readily be supplied elsewhere in the state."
 
 
 [4]
 The Court notes that there are other directives that require the Forest Service to evaluate and analyze resources in the immediate area of a national forest. For example, the Forest Service regulations state that regional and forest planning will be based, inter alia, on "[r]ecognition that the National Forests are ecosystems and their management for goods and services requires an awareness and consideration of the interrelationships among plans, animals, soil, water, air, and other environmental factors within such ecosystems." 36 C.F.R. § 219.1(b)(3) (1992). Such ecosystems very often will extend to the area surrounding a national forest's boundaries. Similarly, NEPA requires the Forest Service to consider what environmental impacts forest management will have outside forest boundaries. The Forest Service properly complied with these directives in adopting its ALRMP for the Shawnee. The Court finds nothing in the record to support the plaintiffs' claim that the Forest Service considered surrounding areas when such considerations supported its decision but ignored them when they did not
 
 
 [5]
 The explanations that appear in the appendix were incorporated by reference into the formal Record of Decision. (See ROD for ALRMP at 3 ("Appendix I of the FSEIS documents our response to public comments on the draft documents and includes specific reasons for making or not making changes to the Proposed Amended Plan.").) Thus, the reasoning set forth in the appendix supplements the more succinctly written reasons in the text of the Record of Decision itself and, therefore, constitute part of the basis articulated by the Forest Service for its decision. As a result, the Forest Service's reference to these reasons during these proceedings cannot be considered "post hoc rationalizations," as suggested by the plaintiffs. See Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50 (1983) ("the courts may not accept appellate counsel's post hoc rationalizations for agency action.... It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.")
 
 
 [6]
 Although this study was not among the documents submitted by the Forest Service as part of the administrative record, the study is appropriately part of the administrative record because it was not only referenced in Chapter 7 of the FSEIS but also discussed extensively within the comment section of the appendix, which was incorporated by reference into the
 
 
 [7]
 The Court will use the terms "cumulative impacts" and "cumulative effects" interchangeably. NEPA itself refers to effects, while the Code of Federal Regulations refers to impacts. Nevertheless, the terms are interchangeable, and have been treated as such by courts and commentators. Record of Decision
 
 
 [8]
 Similarly, it is insufficient to merely state that the cumulative effects are insignificant. This type of conclusory statement fails to provide the type of analysis required by NEPA and the CEQ regulations. Requiring the Forest Service to articulate its reasoning in the FSEIS and ALRMP ensures that the Forest Service adequately considers the consequences of its actions. Furthermore, this type of documentation is the only way a reviewing court can assess the Forest Service's actions are arbitrary or capricious
 
 
 [9]
 This document, although submitted by the plaintiffs as an exhibit, is part of the administrative record. The index to the administrative record indicates that this letter is part of the administrative record. (Administrative R. Index at 23.) Furthermore, even if the Forest Service chose to omit this letter from the records filed with the Court, it would be proper for the Court to consider the letter because the Forest Service received and considered the letter while preparing the FSEIS and ALRMP
 
 
 [10]
 The plaintiffs also argue that the HEP used incorrect figures for the suitable habitat for forest interior species. The FSEIS states that 213,000 acres (or about 80 percent) of the forest will be available for such species. (FSEIS at 4-107.) That figure is considerably larger than the area that has been designated for FIMUs, i.e., the areas preserved as forest interior habitat. Thus, upon first impression, it would appear that the HEP analysis used erroneous data with respect to the actual suitable habitat for such species. However, a review of the Wildlife and Diversity Analysis in the appendix to the FSEIS demonstrates that the Forest Service made a more exacting analysis of the precise acreage of suitable habitat for each species. (See, e.g., FSEIS App. at H-21 (explaining that projections for Cerulean Warbler were based on estimate of finding .020 birds per acre in bottomland hardwoods over 50 years old but .010 birds per acre of mature upland hardwood forest).) The plaintiffs have not acknowledged this more detailed statement of the analysis, much less identified any flaws in it. The Court, therefore, does not find this aspect of the HEP analysis to be arbitrary or capricious
 
 
 [11]
 For example, the FSEIS very clearly states that the ALRMP will not ensure the viability of the Pine Warbler because the plan's ecological restoration plan will lead to eradication of the bird's pine habitat. In Glisson v. United States Forest Service, No. 92-CV-4205-JLF, slip op. at 14-18 (S.D.Ill. Aug. 24, 1993), the Court held that 36 C.F.R. § 219.19 required the Forest Service to ensure viability only of native species and desired non-native species. The Court found insufficient evidence in the record to show that the Pine Warbler was a native species and, therefore, held that it was within the Forest Service's discretion to adopt a plan that did not ensure the viability of that species. Id
 
 
 [12]
 The Forest Service attempts to support its argument by citing Sierra Club v. Robertson, 845 F.Supp. 485, 494 (S.D.Ohio 1994), which stated that it would be a violation of the MUSYA to exclude timbering in favor of other uses. However, that decision did not address the language in § 531(a) that makes it clear that some forest land may be used for less than all of the resources
 
 
 [13]
 The pertinent parts of the table are as follows:
 Year Value Cost Volume
 1987 85.51 75.46 8,885
 1988 107.29 91.21 4,927
 1989 126.00 158.92 737
 1990 202.58 146.54 1,317
 Avg. 103.87 90.13
 
 
 [14]
 The Forest Service does not contest the fact that the figures used were erroneous. Therefore, the Court need not decide whether this document should be considered part of the administrative record
 
 
 [15]
 The corrected table, which included data for 1991 and 1992 is as follows:
 Year Value Cost Volume
 1987 85.51 75.46 8,885
 1988 99.62 91.21 4,927
 1989 126.00 158.92 737
 1990 143.34 146.54 1,317
 1991 137.88 255.40 804
 1992 0 0 0
 Avg. 98.57 98.10
 
 
 [16]
 The plaintiffs complain that the distinction between corridors and trails "has been lost on ATV users." Although the Forest Service has not yet designated any ATV trails, the plaintiffs state that ATV users are already using the corridors and causing site-specific harm. This argument, however, does not implicate the Forest Service's obligations under NEPA. As stated above, the ALRMP's identification of ATV corridors did not authorize use of the area; it merely provided that ATV trails could be located within those areas in the future if that proves to be a sound decision after completing a site-specific analysis. The fact that some ATV users have jumped the gun may indicate that the Forest Service should increase its enforcement efforts but it does not mean that the Forest Service must do a site-specific analysis regarding the ATV users' unauthorized use of the corridors
 
 
 [17]
 Although the Forest Service does not cite the case in support of their argument regarding the cumulative effects analysis, there is some language in Donham v. United States Forest Serv., No. 93-CV-4172-JPG (S.D.Ill. Jan. 24, 1995), that might indicate that the Court has previously addressed the cumulative effects issue in the Forest Service's favor. However, in that case, plaintiff's challenge was to the use of man-made boundaries instead of ecological boundaries, in conducting the cumulative effects analysis. See slip op. at 19-21. Thus, the Court did not consider whether the cumulative effects analysis was sufficient, but rather decided that the Forest Service was within its discretion to use man-made boundaries. Any language in Donham that might be construed as approving the cumulative effects analysis in the FSEIS is disavowed
 
 
 [18]
 The historical basis for the program was explained in Glisson v. United States Forest Service, No. 92-CV-4205-JLF, slip op. at 2-3 (S.D.Ill. Aug. 24, 1993), as follows:
 Prior to early European settlement of the area in the early 1800s, the land was dominated by native hardwood trees and open glades or barrens communities. During the next century, brush and trees encroached upon the open barrens areas as a result of a significant reduction in the forest fires once used by Native Americans for hunting purposes. At the same time, the settlers removed some of the hardwood trees for farming. The land was farmed intensively "through the 1920's and 1930's when worn-out soil, erosion, drought, and the Great Depression caused many farmers to abandon the land."
 ....
 The federal government purchased the lands as part of the Shawnee National Forest during the 1930s, and the Forest Service and the Civilian Conservation Corps "began the first phase of restoring many of these old fields by planting pine trees to control erosion and revegetate the area." Ecological restoration is "[t]he final phase of this reclamation, returning these pine plantations to native (presettlement) ecosystems...." ... Accordingly, the Forest Service has identified ecological restoration as one of the long-term management goals of its Amended Forest Plan.
 
 
 [19]
 The plaintiffs complain that the regional forester did not explicitly state that the pine conversion was justified as required by section 219.27(g). However, this conclusion is obvious from the context of the FSEIS and the record of decision as a whole. Although the regional forester could have stated this precise conclusion more clearly, "a reviewing court may ... 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.' " Cronin v. United States Dep't of Agric., 919 F.2d 439, 442 (7th Cir.1990) (citations omitted)